110 N.J. Super. 34 (1970)
264 A.2d 257
SYRIAN ANTIOCHIAN ORTHODOX ARCHDIOCESE OF NEW YORK AND ALL NORTH AMERICA, A CORPORATION OF THE STATE OF NEW YORK, PLAINTIFF,
v.
PALISADES ASSOCIATES, A LIMITED PARTNERSHIP, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided April 13, 1970.
*35 Mr. J. Mortimer Rubenstein for plaintiff (Mr. Allan M. Harris on the brief; Messrs. Rubenstein, Albert and Loukedis, attorneys).
Mr. Samuel J. Davis for defendant.
Mr. Milton Prigoff for intervenors (Messrs. Lebson and Prigoff, attorneys).
MOUNTAIN, J.S.C.
This is a declaratory judgment action in which other incidental relief is sought. On April *36 7, 1969 plaintiff acquired by deed from defendant Palisades Associates a tract of land in the Borough of Alpine, Bergen County. By the terms of the deed plaintiff-grantee covenanted as follows:
FIRST: That there shall not be erected or maintained on the premises hereinabove described and hereby conveyed any buildings whatsoever except a private dwelling and except a garage appurtenant thereto for use by not more than one family.
SECOND: That no portion of said premises shall be used for any trade or business purposes whatsoever, except as an office or offices of professional persons residing on the premises, nor shall any nuisance on, or any use of, said premises be permitted which shall be noxious or dangerous to health
THIRD: That there shall not be erected any building, fence, wall, advertising sign or other structure or improvement on said premises, nor any exterior addition to, or change or alteration therein, be made, unless and until the plans and specifications therefor, and the grading plan of the plot to be built upon, showing the location of the proposed improvement upon the plot, shall have been submitted to and approved in writing by the Grantor, and a copy thereof, as finally approved, filed permanently with the Grantor. The Grantor shall have the right to refuse to approve any such plans or specifications or grading plan, or location or the proposed improvement, which are not suitable or desirable in its opinion.
FOURTH: That the said premises shall not be sold without first giving the grantor an option in writing for ten (10) days to purchase the same at the price and upon the same terms offered by the proposed purchaser; and that neither the said premises, nor any part thereof, shall be conveyed, leased or mortgaged without making specific reference in such instrument to the said covenants and restrictions, and conveying, leasing or mortgaging the premises subject thereto, but this requirement shall not apply to any sale pursuant to a judgment of foreclosure of any mortgage hereafter placed on said premises, nor to the delivery of a deed to a mortgagee in lieu of foreclosure of such a mortgage.
FIFTH: That these covenants and restrictions and each of them are hereby declared and agreed to be, and they shall be, taken and construed as covenants attached to and running with the land, and said covenants and restrictions shall remain in force until * * *.
In October 1969 pursuant to the third covenant set forth above, plaintiff submitted plans to defendant for the erection of a building on the property to be used as the residence and professional office of its archbishop. Defendant refused to give its approval, indicating as reason that some *37 of the neighbors objected. Several landowners in the immediate neighborhood, claiming to be entitled to the benefit of the covenants, have been granted leave to intervene. In fact, the covenants were exacted by defendant from all grantees of property the whole of which was at one time owned by it. It was the common grantor. The existence of a neighborhood scheme is clear, and hence there is no doubt as to the standing of the intervenors to seek enforcement of the covenants.
It is initially argued that the building for the construction of which permission is sought will not be a "private dwelling" and will therefore, both as to its erection and maintenance, be in violation of the first covenant.
Plaintiff proposes to erect a building to be used as the private residence of its archbishop in which he will also maintain professional offices. In addition to providing a dwelling for the archbishop himself, the residence will be occupied by a priest to serve as his personal attendant and by a cook and housekeeper. A personal secretary, who apparently will not live on the premises, will be present about 40 hours a week. There will be eight bedrooms. Those on the first floor, three in number, are designed for the accommodation of the domestic staff. Of those on the second floor, two will be used by the archbishop personally, one by the attending priest and the remaining two as guest rooms for visiting dignitaries. A small chapel is intended for purposes of private devotion and will not be available for public worship. There will be a dining room, dinette, library, kitchen, various utility areas and a three-car garage, as well as the archbishop's office and an adjoining room for his secretary. As already mentioned, the intervenors contend that the structure will not be "a private dwelling * * * for use by not more than one family." For the reasons set forth below, I do not agree.
A building is no less a private dwelling because it is the residence of one holding a position of prominence in an ecclesiastical hierarchy. It is the use to which the *38 structure is put that is of significance. For there to be a violation of such a covenant, "[t]he house must be used for some other purpose than a residence." Hunter Tract Imp. Co. v. Corp. of Catholic Bishop, 98 Wash. 112, 167 P. 100, L.R.A. 1918A, 297 (Sup. Ct. 1917). Here the only permitted use other than as a residence is "as an office or offices of professional persons residing on the premises." This is the only other use projected by plaintiff: the building, in addition to its intended purpose as a private residence, will contain the professional offices of the archbishop. It hardly needs reminding that "[t]he ministry is one of the * * * professions." Missionaries of Our Lady of LaSalette v. Village of Whitefish Bay, 267 Wis. 609, 66 N.W.2d 627, 632 (Sup. Ct. 1954).
The cases presenting this question have generally dealt either with a zoning ordinance or a restrictive covenant prescribing single-family use. A situation similar to that before the court involving a restrictive covenant arose in Hunter Tract Imp. Co., supra. The deed provided that "[n]othing but a single detached residence * * * shall be built on any one lot described in this deed and when so built shall be used for residence purposes only." A group of 12 or 15 members of the Catholic sisterhood of the Ursulines had taken up residence in a large dwelling house on the property which was subject to the covenant. One room had been altered to become a private chapel where services were held every morning. The court pointed out that restrictive covenants are to be strictly construed and added that "[t]he fact that religious services are held in the house every morning by a priest, or that a small altar has been erected, does not take away from these premises their character as the home or residence of the women who live there." In Boston-Edison Protective Ass'n v. Paulist Fathers, Inc., 306 Mich. 253, 10 N.W.2d 847 (Sup. Ct. 1943) the covenantor had agreed that she would "not use or occupy said lots except for a single dwelling house and [for] dwelling house purposes only." The residence contained *39 six bedrooms and five smaller rooms, and was occupied by five priests of the defendant order and two servants. As is the case before this court, there were no religious services to which the public was invited, no lectures, nor was any missionary work undertaken. The court held that this utilization of the property did not offend the covenant.
In Village of Whitefish Bay, supra, the premises were zoned for one-family use only. The ordinance defined a family as "one or more individuals living, sleeping, cooking or eating on premises as a single housekeeping unit." Three priests and two lay brothers were in residence in a 20-room (10-bedroom) dwelling with a private chapel. The court held that a "family" was not intended to be confined to persons related by blood or marriage, and that there was no violation of the ordinance. A similar result was reached in Carroll v. City of Miami Beach, 198 So. 2d 643 (Fla. App. Ct. 1967), where the ordinance defined "family" in almost identical language and a small group of novices or applicants to a religious order were in residence under the direction of a Mother Superior. See also, Scott Co. v. Roman Catholic Archbishop, Diocese of Oregon, 83 Or. 97, 163 P. 88 (Sup. Ct. 1917).
Here the proposed structure, appropriately staffed, is to be used by the archbishop as his private residence and will contain his professional offices. All of this is permitted by the express terms of the restrictive covenants.
Plaintiff challenges the validity of the third covenant as imposing an unreasonable restraint upon the use and alienation of its property, principally, it would seem, in that no objective standards are set forth in the covenant to guide defendant Palisades Associates in reaching a determination to approve or disapprove plans, specifications and grading and site proposals. It is urged that this provision gives the grantor-defendant a right of capricious and arbitrary determination which is contrary to public policy and hence unenforceable. In support of this contention plaintiff refers *40 to Mountain Springs Ass'n. v. Wilson, 81 N.J. Super. 564 (Ch. Div. 1963), and Tuckerton Beach Club v. Bender, 91 N.J. Super. 167 (App. Div. 1966). These cases are not in point. They each involved a covenant forbidding alienation to any person who had not or could not become a member of an association made up of property owners. In each case membership could be denied for any reason or for no reason. This type of provision  only a thinly veiled attempt to support discrimination  is, of course, no longer sanctioned and in each case the covenant was deemed unenforceable.
Here we are faced with a quite different problem. The type of covenant under consideration is in fairly common use, at least in certain parts of the State. Normally the developer-common grantor exacts the covenant from each grantee who will not thenceforth be at liberty to construct or alter any improvement on the conveyed premises without first submitting the proposal to the grantor and securing his written approval. Often, and wisely, this approval is to be in recordable form. The purpose of such a provision is to afford mutual protection to the property owners living in the development against injury, whether taking the form of diminished property values or otherwise, that would result from the construction of a residence or other improvement that was unsightly, in singularly bad taste, discordantly at variance with neighboring homes in architectural appearance, or otherwise offensive to the proposed or developed standards of the neighborhood. The most commonly voiced criticism of such an arrangement is that it is vague, fixes no standards and hence affords the grantor an opportunity to be capricious, unfair and arbitrary.
At this point a distinction should be noticed. We are not dealing with legislation, whether in the form of a zoning ordinance or otherwise, but with a contractual obligation. The requirement that legislation embody objective standards, especially where authority is delegated, finds its basis in constitutional necessities. The Constitution imposes no similar stricture with respect to private compact.
*41 In Urban Farms, Inc. v. Seel, 87 N.J. Super. 177 (Ch. Div. 1965), Judge Pashman approved such a covenant as the one we are considering. In its opinion of affirmance, 90 N.J. Super. 401 (App. Div. 1966), the reviewing court determined, however, that there had been no breach of the covenant and therefore found it unnecessary to pass upon its validity. It did indicate, however, by way of dictum, that if such a covenant is valid, any disapproval must be reasonable and determined in good faith. Elsewhere such covenants have been very generally sustained. The decisions have recognized the inherent desirability of such protective arrangements, but in sustaining them have pointed out that any disapproval must be reasonable and made in good faith. Thus in Hannula v. Hacienda Homes, Inc., 34 Cal.2d 442, 211 P.2d 302 (Sup. Ct. 1949), the court considered a covenant which read, "No dwelling house or other house or structure shall be erected until the plans and specifications with the proposed site therefor have been submitted to and approved by the first party hereto and by Hacienda Homes, Inc., and a written permit issued therefor." It held the provision valid, only pointing out that a rejection must be reasonable and the review of any proposal exercised in good faith. A similar result was reached in Kirkley v. Seipelt, 212 Md. 127, 128 A.2d 430 (Ct. App. 1957). Here the covenantor sought to erect metallic, hard-surfaced, permanent awnings and porch covers over windows and porches. The grantor-covenantee refused approvel upon the ground that this proposed alteration would render the facade of the dwelling unattractive in appearance and would diminish the value of properties nearby. The court sustained the validity of the covenant and found that defendant's disapproval was reasonable and had been arrived at in good faith. In Winslette v. Keeler, 220 Ga. 100, 137 S.E.2d 288 (Sup. Ct. 1964), the court sustained a covenant requiring that any construction or alteration must be suitable, in the opinion of the grantor, "as to conformity and harmony of external design and general quality with existing standards of the neighborhood."
*42 A very interesting recent decision is Rhue v. Cheyenne Homes, Inc., 449 P.2d 361 (1969). The Supreme Court of Colorado was called upon to consider a covenant which read, "No building shall be erected, placed or altered on any lot until the construction plans and specifications and a plan showing the location of the structure shall have been approved by the architectural committee * * *." An owner of property in whose chain of title the covenant appeared wished to move to the site a 30-year-old Spanish style home with stucco exterior and red tile roof. The development in which the premises were located was 80% improved with modern ranch style and split level homes. The grantor refused approval upon the ground that the proposed improvement, if allowed, would diminish the value of other properties in the neighborhood and would be an unsightly variation from the architectural pattern that had been established. In sustaining the disapproval the court observed:
It is no secret that housing today is developed by subdividers who, through the use of restrictive covenants, guarantee to the purchaser that his house will be protected against adjacent construction which will impair its value, and that a general plan of construction will be followed. Modern legal authority recognizes this reality and recognizes also that the approval of plans by an architectural control committee is one method by which guarantees of value and general plan of construction can be accomplished and maintained.
In disposing of the argument that the covenant was against public policy as permitting the developer to exercise an arbitrary and capricious power, the court observed:
While we have here enunciated the proposition that the covenant requiring the approval of the architectural committee before erection of a house in the subdivision is enforceable, we point out that there is a corollary to that proposition which affords protection and due process of law to a purchaser of a lot in the subdivision, namely, that a refusal to approve plans must be reasonable and made in good faith and must not be arbitrary or capricious.
*43 Other authorities to the same effect include Engvalson v. Webster, 74 So.2d 113 (Fla. Sup. Ct. 1954); Parsons v. Duryea, 261 Mass. 314, 158 N.E. 761 (Sup. Jud. Ct. 1927); Fairfax Community Association v. Boughton, 70 Ohio Law Abst. 178, 127 N.E.2d 641 (Ohio C.P. 1955), and Harmon v. Burow, 263 Pa. 188, 106 A. 310 (Sup. Ct. 1919).
The third covenant, for the reasons discussed above, is valid and enforceable. As mentioned earlier in this opinion, plans submitted by plaintiff to defendant were rejected by the latter without any clear specification of the reasons for the rejection being given. Plaintiff is directed to resubmit to defendant its "plans and specifications * * * and the grading plan of the plot to be built upon, showing the location of the proposed improvement upon the plot." Within 20 days of such submission defendant shall deliver to plaintiff in writing its approval or disapproval. If disapproved, the rejection is to be accompanied by the specific reasons therefor considered in the light of this opinion. The court retains jurisdiction.