WESTFIELD HOMES, INC., *et al.*, Plaintiffs-Appellants, v. MICHAEL HERRICK *et al.*, Defendants-Appellees.

Second District   No. 2—91—0796

Opinion filed May 12, 1992.

Bernard Wysocki, of Bernard Wysocki & Associates, P.C., of Waukegan, for appellants.

Richard J. Nakon and James W. Kaiser, both of Richard J. Nakon & Associates, of Wauconda, for appellees.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Plaintiffs, Westfield Homes, Inc., and Westridge Homeowners Association, filed suit seeking to enjoin defendants, Michael and Andrea Herrick, from maintaining and using an above-ground swimming pool on their property allegedly in violation of a restrictive covenant applicable to defendants' property. The trial court denied relief, and plaintiffs appeal, contending that the court misconstrued the language of the covenant and ignored unrebutted testimony of the violation of the covenant when it refused to grant an injunction. Defendants filed a

motion to strike plaintiffs' reply brief. We ordered defendants' motion and plaintiffs' response to be taken with the case. We affirm.

Plaintiff Westfield Homes is the developer of the Westridge subdivision in Island Lake, Illinois. In conjunction with the development, Westfield recorded a "Declaration of Covenants, Conditions, Restrictions and Easements For Westridge Homeowners Association" (hereafter the covenant). By this document, all lots in Westridge became subject to its terms. The covenant provides for the creation of the Westridge Homeowners Association, which is to be the governing body for the administration of Westridge. The covenant also provides for an architectural review committee which is to review the plans for all construction and improvements in the subdivision, except homes constructed by Westfield.

In January 1990, defendants visited Westridge while looking for a new home. They were helped by one of Westfield's sales agents, Marjorie "Misty" Wright. Defendants returned to Westridge in March. At that time, they asked Wright whether above-ground pools were permitted in the subdivision because they had an above-ground pool at their present home and this would be a "very big factor" in deciding whether to purchase a new home. According to Andrea Herrick, Wright then referred to the covenant. She pointed out that certain structures, such as television antennas, clotheslines and satellite dishes are specifically prohibited, but that an above-ground pool was not so prohibited. Andrea Herrick said that Wright then told her that a pool was "not specifically mentioned and that it wouldn't be a problem."

The Herricks told Wright that they were interested in purchasing a lot. However, only one lot was available for the model home they wanted, and the Herricks determined that the lot was unsuitable for their purposes, which included construction of the pool. Wright advised them to return on April 20, when additional lots would become available. They returned on that day and put down a $500 deposit on a lot. Two days later, they returned to sign the contract with Wright. At that time, they were given a copy of the covenant. The Herricks sent the contract and covenant to their attorney for review.

During the summer of 1990, Michael Herrick returned to the sales office numerous times. He often discussed having a pool with members of the sales staff. Since the Herricks' lot is adjacent to the sales office, the staff joked about using the pool during their lunch hours.

After the Herricks purchased their home, Christa Zink and her husband also signed a contract to purchase a home in Westridge. Mrs. Zink also discussed the possibility of an above-ground pool with

Wright. According to Zink, Wright had a telephone conversation with Robert Siuda, plaintiff's vice-president of sales and marketing, who determined that the Zinks' lot would be sufficient for an above-ground pool.

Defendants' home was subsequently completed and they moved in. They purchased a pool on April 18, 1991. According to Michael Herrick, excavation work for the pool began between April 21 and April 26, and construction was completed sometime during the day of Saturday, May 18.

Brian Harris is Westfield's vice-president of construction. He and Bob Siuda also comprise the architectural review committee. On May 14, 1991, Harris noticed some excavation on defendants' property. On May 15, he sent a letter as president of the Westridge Homeowners Association to defendants. The letter stated that it appeared defendants were constructing an above-ground pool, that they had to submit a request to the architectural review committee for such an improvement, and that they must discontinue further work. The letter referred specifically to the provisions of the covenant.

The Herricks maintain that they did not retrieve the letter from their mailbox until Sunday, May 19, after construction of the pool was complete. They promptly submitted a request which included plans for the pool, a deck, a shed, a screened-in porch and a sandbox.

On May 29, 1991, defendants received a letter from the Association approving their deck, screened-in porch and sandbox, but disapproving the pool and shed. Michael Herrick immediately called Harris. Herrick spoke to both Harris and Siuda by speakerphone, but the three were unable to resolve the dispute. Plaintiffs then filed the instant suit for an injunction requiring the removal of the pool.

The trial court initially granted a temporary restraining order. Following trial, the court ruled that the covenant did not give plaintiff the power to prohibit an above-ground pool. The court held that the provisions of the covenant requiring plans to be submitted to the architectural review committee were valid, but that the committee had to exercise its review powers in a reasonable, nonarbitrary manner. The court further held that a complete prohibition was not reasonable under the facts of the case. The court also found that the reasons given for the disapproval of defendants' plans were vague. The court granted plaintiffs eight days to provide defendants with reasonable conditions and restrictions for the construction of an above-ground pool on their property. The court stated that it would then issue a permanent injunction in accordance with the reasonable conditions and restrictions.

At the end of the eight days the attorneys for all parties again appeared before the trial court. Plaintiffs' attorney stated that plaintiffs were unwilling to provide conditions for the construction of a pool, but would stand on their unconditional denial. The court thereupon dissolved the temporary restraining order and entered judgment for defendants.

### DEFENDANTS' MOTION TO STRIKE

■ Defendants filed a motion to strike plaintiffs' reply brief, and we ordered the motion and plaintiffs' response taken with the case. Defendants' motion appears to be merely a surreptitious surreply to the reply brief. Defendants essentially contend that any arguments not strictly raised in the plaintiffs' opening brief should be stricken for being raised for the first time in the reply and any arguments which were previously raised should be stricken as redundant. In fact, the vast majority of the material which defendants find objectionable is proper reply to arguments raised in the defendants' brief. (See, *e.g., People v. Brownell* (1984), 123 Ill. App. 3d 307, 319-20.) We therefore deny the motion to strike the reply brief, but will disregard any improper matter contained therein.

### TRIAL COURT'S DENIAL OF PERMANENT INJUNCTION

On appeal plaintiffs raise two issues, which can be summarized as a contention that the trial court abused its discretion in failing to grant a permanent injunction where it was essentially undisputed that defendants violated the covenant.

■ In reviewing a trial court's decision to deny an injunction, our function is to determine whether the lower court's factual findings are contrary to the manifest weight of the evidence. (*Millard Maintenance Service Co. v. Bernero*, 207 Ill. App. 3d 736, 743.) The trial court's ruling will not be set aside absent an abuse of discretion. *Millard Maintenance Service* (1990), 207 Ill. App. 3d at 744.

The trial court's ruling was based on the language of the covenant, as well as principles of law applicable to covenants generally. Thus, before we proceed to a discussion of the relevant authorities, we must set forth the relevant provisions of the covenant at some length. Article VI sets forth numerous specific "restrictions," which are actually complete prohibitions. Within that article, paragraph 6.01 provides that no lot shall be used for other than residential purposes. Paragraph 6.02 provides that front and side yards must be seeded or sodded to the curb line and that owners shall not permit grass or weeds to grow to a height in excess of five inches. Paragraph 6.03

specifically prohibits several types of structures and provides as follows:

"6.03 Lot Use Restrictions

(a) No outdoor clothes-lines, microwave, shortwave or other towers for the reception or transmission of television electrical signals, or electrical or high intensity lighting shall be erected, constructed or placed on any portion of the Property.

(b) There shall be no parking of recreational vehicles, boats, trailers, tent trailers or tractor/trailer components, permanently or temporarily, in any location in front of the front building line of the lot."

Article VII provides for the creation and operation of the architectural review committee (ARC). Within that article, paragraph 7.01 provides that as long as the developer owns any real estate in the development it shall be the sole member of the ARC. Paragraph 7.02 then sets forth the requirements for obtaining review, providing as follows:

"7.02 Architectural Controls: In addition to the ordinances set forth in 6.02, above, no building, fence of any kind whatsoever (including metal or cyclone fences), wall, structure (except for a residence which may be constructed by Developer), or other improvement shall be commenced, erected, or maintained on any Lot, nor shall any addition to or change or alteration therein be made, except interior alterations, until the construction plans and specifications, showing the nature, kind, shape, height and materials, color scheme, location on the Lot, and the grading plan and landscape plan of the Lot be [sic] built upon, shall have been submitted to and approved in writing by the Architectural Review Committee, except as noted below. The Architectural Review Committee shall, in its sole discretion, have the right to refuse to approve any such construction plans, specifications or grading plan for aesthetic or other reason, and in so passing upon such construction plans and specifications, or grading plan, the Committee shall have the right to take into consideration the suitability of the proposed improvement with the surroundings, and the erection of the improvement on the view from adjacent or neighboring properties. Pressure treated lumber, cedar, and redwood lumber decks and concrete patios shall be permitted by the Architectural Review Committee without written approval provided that the decks and patios are at the rear of the residential unit and provided

further that no wood railing appurtenant thereto shall be greater than six (6) feet in height."

In reaching its decision, the trial court noted that article VI specifically prohibits several types of structures, including television antennas and clotheslines, but that above-ground swimming pools are not specifically prohibited. The court then reasoned that, since pools are not specifically prohibited under article VI, the ARC could not exercise its discretion to completely bar construction of a pool. Rather, the exercise of its discretion was limited to imposing reasonable restrictions on the design and construction of a pool to minimize the auditory and visual impact on the neighboring properties under article VII. The court noted that the decisions of an ARC pursuant to a restrictive covenant must be reasonable and not arbitrary and capricious. The court held that a flat denial of a structure not specifically prohibited amounted to an unreasonable exercise of discretion.

Plaintiffs disagree with this interpretation. They contend that "[y]ou cannot have an ability to regulate unless you have the ability to prohibit, through your regulations." Plaintiffs maintain that they cannot be expected to anticipate every possible type of structure which they might subsequently wish to prohibit and thus the listing in article VI was not intended to be exclusive. Defendants respond that the trial court was correct in finding that plaintiffs' prohibition was unreasonable under the circumstances.

■ A restrictive covenant should be construed to give effect to the actual intention of the parties at the time the covenant was made. (*Streams Sports Club, Ltd. v. Richmond* (1983), 99 Ill. 2d 182, 188; *Saddle Hills Community Association v. Cavallari* (1986), 150 Ill. App. 3d 134, 136.) Such intention should be determined from the language of the document as a whole and in connection with the circumstances surrounding its execution. (*Amoco Realty Co. v. Montalbano* (1985), 133 Ill. App. 3d 327, 331.) In general, covenants should be strictly construed in favor of the full and unlimited use of property. (*Engler v. Tenhaaf* (1979), 74 Ill. App. 3d 799, 803.) However, the rule of strict construction will not be applied to defeat the obvious purpose of the covenant. *Amoco Realty*, 133 Ill. App. 3d at 331-32.

■ A restrictive covenant in which the developer reserves the right to consent to building plans will be enforced, but the exercise of the power of review in a particular case must be reasonable and not arbitrary. (*Rhue v. Cheyenne Homes, Inc.* (1969), 168 Colo. 6, 9, 449 P.2d 361, 363; 20 Am. Jur. 2d *Covenants* §182 (1965); Annot., 40 A.L.R.3d 879 (1971).) The parties have not cited, nor has our research uncovered, any case in which a blanket prohibition of a particular type

of structure not specifically prohibited by the covenant was considered. The majority of the reported cases deal with construction of residences. In these cases, the construction of some type of residence is expressly contemplated, and the only question is whether the style, size or cost of the residence comports with the scheme of development of the community. In *Rhue*, for example, plaintiffs desired to move a 30-year-old, Spanish-style ranch onto a lot in defendants' subdivision, which consisted of modern, split-level houses. (*Rhue*, 168 Colo. at 7, 449 P.2d at 362.) The court held in the context of the declaratory judgment action that a refusal to approve the plan would not be unreasonable. (*Rhue*, 168 Colo. at 10, 449 P.2d at 363.) The developer did not state that it would not approve any type of residence.

■ We note that the parties do not dispute that a swimming pool is a "structure *** or other improvement" within the meaning of the covenant. (See *Lindner v. Woytowitz* (1977), 37 Md. App. 652, 657, 378 A.2d 212, 216; *Greenberg v. Koslow* (Mo. App. 1971), 475 S.W.2d 434, 437.) In determining whether a flat denial of an above-ground pool is reasonable under the circumstances, we must consider the purposes sought to be served by the covenant. One court summed up the purpose of such agreements as follows:

> "The purpose of such a provision is to afford mutual protection to the property owners living in the development against injury, whether taking the form of diminished property values or otherwise, that would result from the construction of a residence or other improvement that was unsightly, in singularly bad taste, discordantly at variance with neighboring homes in architectural appearance, or otherwise offensive to the proposed or developed standards of the neighborhood." (*Syrian Antiochian Orthodox Archdiocese v. Palisades Associates* (1970), 110 N.J. Super. 34, 40, 264 A.2d 257, 261.)

The preamble to the covenant in question declares that it is "for the purpose of enhancing and protecting the value of" the lots in the subdivision. The trial court noted that the proposed pool was not unsightly or in singularly bad taste such as to justify a total prohibition. The court contrasted the instant proposal with "a structure just as simple as a birdhouse, if it would be a small birdhouse *** but the colors were to be bright yellow with chartreuse polka dots." Photographs and samples of exterior siding from defendant's home and pool were introduced into evidence. This evidence shows that the proposed pool, rather than having chartreuse polka dots, is relatively harmonious with the exterior of defendants' house.

Complete prohibitions of structures other than residences have been discussed in only a few cases. In *Plymouth Woods Corp. v. Maxwell* (1962), 407 Pa. 539, 181 A.2d 321, the covenant provided that "[b]uyer shall not place any sign, fence, or other structure upon the premises without first obtaining the written consent of Seller." (*Plymouth Woods*, 407 Pa. at 540, 181 A.2d at 322.) The developer denied defendant's request to place a "for sale" sign in front of his house. The court denied the developer's request for an injunction requiring the removal of the sign. The court applied a balancing of the equities test and concluded that the injury to defendant far outweighed any conceivable benefit to plaintiff. (*Plymouth Woods*, 407 Pa. at 543, 181 A.2d at 324.) While Illinois courts have not expressly adopted a balancing of the equities test in enforcing the provisions of restrictive covenants, we believe that, read another way, the *Plymouth Woods* court was merely saying that the blanket prohibition was unreasonable under the circumstances. There was nothing in the record to show that the sign was unusually large or in bad taste.

In *Lindner v. Woytowitz* (1977), 37 Md. App. 652, 378 A.2d 212, the structure at issue was an above-ground pool. The court affirmed the awarding of an injunction to the developer because defendants had never submitted plans to the ARC at all. The court went on to state:

> "[N]othing in this opinion would preclude the [homeowners] from submitting to the [developer] for approval the plans and specifications for an above-ground swimming pool. [The developer] would then be required to approve or disapprove in accordance with the principles enunciated in a number of cases ***.
>
> '*** that approval or disapproval must be reasonable.' "
> *Lindner*, 37 Md. App. at 659-60, 378 A.2d at 217, quoting *Carroll County v. Buckworth* (1964), 234 Md. 547, 200 A.2d 145.

See also *Saddle Hills Community Association v. Cavallari* (1986), 150 Ill. App. 3d 134 (court affirmed the awarding of an injunction to the developer ordering homeowner to remove a chain-link fence where homeowner never submitted plans to ARC).

▪ In the instant case, we agree with the trial court that the blanket denial was unreasonable under the circumstances. Nothing in the covenant states that an above-ground pool will be prohibited under any circumstances, although other items are specifically prohibited. Nothing in the record indicates that defendants' proposed improvements would be unsightly or in "singularly bad taste." The court

offered plaintiffs ample opportunity to promulgate reasonable conditions for the construction, but plaintiffs chose not to submit such conditions to the court. Plaintiffs could, for example, have required fencing around the pool area, which would have addressed concerns about noise, visibility and safety. We conclude that the trial court did not abuse its discretion in denying plaintiffs a permanent injunction.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

UNVERZAGT and NICKELS, JJ., concur.