AMOCO REALTY COMPANY *et al.*, Plaintiffs-Appellants and Cross-Appellees. v. ANTHONY MONTALBANO *et al.*, Defendants-Appellees and Cross-Appellants.

Second District   No. 84—62

Opinion filed May 14, 1985.

Keith E. Roberts and Robert R. Verchota, both of Donovan & Roberts, of Wheaton, and Bernard Savin, of Antonow & Fink, of Chicago, for appellants.

Michael McGurn, David F. Pardys, and Gerald B. Gallagher, all of Conklin & Adler, of Oak Brook, for appellees.

JUSTICE STROUSE delivered the opinion of the court:

The plaintiffs, Amoco Realty Company and American Growth-Midwest, Inc., partners doing business as the Midwest Club Company (Midwest Club), appeal the trial court's denial of their request for attorney fees pursuant to a contractual provision. The defendants, Anthony and Susan Montalbano (Montalbanos), cross-appeal from the trial court's grant of injunctive relief. The sole issue raised by the Midwest Club in their appeal is whether the trial court erred in denying the plaintiffs' request for attorney fees. The Montalbanos raise two issues in their cross-appeal: (1) whether the Midwest Club is a proper party to this appeal; and (2) whether the trial court's grant of injunctive relief is against the manifest weight of the evidence.

The Midwest Club Company developed a high-quality residential community located in Oakbrook, known as the Midwest Club. The Montalbanos own two of the 221 lots in that community. Prior to the community's development, the Midwest Club adopted and recorded a document known as the Midwest Club Declaration of Trust (declara-

tion), which described the community's purpose and established the guidelines under which the community would operate. This declaration, recorded on December 7, 1978, in the Du Page County recorder of deeds' office, stated that all covenants and restrictions created by it run with the land, and that every conveyance or other instrument is subject to the covenants and restrictions as firmly as if the covenants and restrictions were fully restated in the conveyance or other instrument.

The declaration proposed to protect and preserve the distinctive qualities, amenities and characteristics of the area so that it would at all times be regarded as a residential community of outstanding excellence. To this end, the declaration reserved to the Midwest Club the right to establish architectural and landscaping controls, and to approve all plans and specifications of the prospective residences. The declaration further authorized the Midwest Club to appoint a control committee to review blueprints and to make recommendations to the Midwest Club before construction commenced. The declaration also provided that the Midwest Club's approval or disapproval of any designs shall be conclusive and binding on all parties.

In pursuing this legal action, the Midwest Club sought to enforce specific provisions of the declaration relating to a covenant restricting the property's use to residential purposes only, and a section prohibiting any structure that would physically or visually obstruct or delineate any boundary contiguous to the community area. These provisions provide:

"5.1 Land Use and Building Type. All lots in the Club Area, except the lot reserved as Community Area, shall be used for single family private residence purposes only, and no dwellings other than a single family private residence shall at any time be constructed or maintained. No regular business of any kind or nature whatsoever shall be permitted or carried on. No building other than a private residence shall be constructed, except that patios, swimming pools, tennis courts, gazebos and other landscape structures properly appurtenant to a fine quality residence and consistent with the character of the Club Area may be constructed.

\* \* \*

5.4 Landscaping Contiguous Community Area. On any Lot boundary contiguous to the Community Area there shall be no landscaping, planting, growth or structure permitted that would have the effect of physically or visually obstructing, defining or delineating said boundary."

Further, the Midwest Club sought to invoke a provision in the declaration indicating that in any legal proceeding arising out of an alleged default by an owner, the trustees, if prevailing, shall be entitled to recover reasonable attorney fees and expenses.

In April 1979, the Midwest Club adopted a second document known as the Architectural and Landscaping Control Manual (control manual). The control manual supported the declaration's prohibitory covenants, stating:

"There shall be no planting, growth or structure permitted that would have the effect of physically or visually obstructing, defining or delineating any lot boundary contiguous to any other lot, or the Community Area."

In April 1980, the control manual was codified and reissued to all lot owners, including the Montalbanos.

In late 1978, the Montalbanos purchased two lots with the intention of building a home on one of the lots. Mr. Montalbano, a contractor, prepared the plans for the residence which designated space on the first floor for an office and reception area for Montalbanos' construction business. Mr. Montalbano testified that Robert Gaimari, general sales manager for the Midwest Club, reviewed the construction plans and told him that he could operate his business from his home if his plans were approved by the control committee. Gaimari denied viewing Montalbano's plans, and claimed to have made no such representation to Montalbano.

Subsequently, the Montalbanos submitted their blueprints to the control committee. After the control committee approved of the plans and specifications, the Montalbanos built their home and moved into the Midwest Club in May 1981. Between August 1981 and May 1983, the Montalbanos operated their construction business from their residence. This involved employees driving their cars and trucks to the home when reporting for work. Mr. Montalbano admitted to having received a copy of the declaration prior to building his home but states he never read it. He testified that had he been aware of the prohibition against the use of a residence as a business, he probably would not have purchased a lot in the Midwest Club.

In addition to operating a business from their home, the Montalbanos constructed four stone, square lightposts which measured 4 feet high and 2 feet wide. These lightposts flanked the two entrances of their circular driveway. The construction blueprints submitted to the control committee did not include any design for these lightposts, and no subsequent plans were submitted for approval. The control committee objected to the existence of the stone light-

posts, finding them inappropriate for their particular function. The testimony of Michael Lach, a civil engineer and a committee member, revealed that had the plans for the lightposts been submitted, they would have been denied by the committee. The committee members agreed the lightposts delineated the boundary line of the lot and the community area. The committee concluded the lightposts were inappropriate and "out of keeping with the character of what was being developed."

On January 21, 1982, the Midwest Club filed suit against the Montalbanos seeking to enjoin the use of their residence for business purposes, and to compel them to remove the stone lightposts. The complaint further requested reasonable attorney fees and expenses should the Midwest Club prevail. The Midwest Club premised its claims on the covenants running with the land and the control manual. After hearing the evidence, the court issued the injunction but denied the request for attorney fees and expenses. As to the issue of the Montalbanos' doing business from the home, the court noted that no waiver of that prohibition occurred. The court reasoned that the mere fact that an office is in someone's home on their plans is not the same as doing business out of that home. As to the issue of removal of the lightposts, the court held they should be removed because they delineate the property boundary between the lot and the community property, they were not included in the plans submitted to the committee, and the control committee acted reasonably in its judgment barring the lightposts.

The Montalbanos assert the declaration's restrictive covenant barring the lightposts was vague, ambiguous, and enforced arbitrarily and not uniformly as to all homeowners. Specifically, they claim that since the term " 'delineating' any boundary line" was left undefined in the declaration, the four stone lightposts could not be interpreted by the committee to "delineate" a boundary between the lot and community property.

■ The paramount rule for the interpretation of covenants is to expound them so as to give effect to the actual intent of the parties as determined from the whole document construed in connection with the circumstances surrounding its execution. (*Streams Sports Club, Ltd. v. Richmond* (1983), 99 Ill. 2d 182, 188; *Lakeland Property Owners Association v. Larson* (1984), 121 Ill. App. 3d 805, 810; *Kessler v. Palmeri* (1972), 3 Ill. App. 3d 901, 904.) The rule of strict construction in favor of the free use of property will not be applied to defeat the obvious purpose of a restriction, even if not precisely expressed; before giving effect to the rule of strict construction,

courts will have recourse to every aid, rule or canon of construction so as to ascertain the parties' intention. (*Hawthorne Hills Association v. Lawrence* (1980), 85 Ill. App. 3d 377, 380-81; *Freehling v. Development Management Group, Inc.* (1979), 75 Ill. App. 3d 243, 248; *Moore v. McDaniel* (1977), 48 Ill. App. 3d 152, 163.) Restrictions should be given the effect which the expressed language of the covenant authorizes. (*Freehling v. Development Management Group, Inc.* (1979), 75 Ill. App. 3d 243, 248; see *Damen Savings & Loan Association v. Johnson* (1984), 126 Ill. App. 3d 940, 944-45.) The generalization that all doubts and ambiguities shall be resolved in favor of free use and against restriction cannot be used to ignore or override specific language of a restrictive covenant. (*Cordogan v. Union National Bank* (1978), 64 Ill. App. 3d 248, 251.) The person in whose favor a restrictive covenant runs is *prima facie* entitled to its enforcement since the mere breach of the covenant is sufficient ground to enjoin its violation. *Wier v. Isenberg* (1981), 95 Ill. App. 3d 839, 842; see also *Freehling v. Development Management Group, Inc.* (1979), 75 Ill. App. 3d 243, 248; *Cordogan v. Union National Bank* (1978), 64 Ill. App. 3d 248, 251.

The underlying purpose of the restrictive covenants and the other guidelines within the declaration is to protect the homeowners of the Midwest Club community. The relevant provisions of the declaration and control manual were promulgated to preserve open vistas and a lush, expansive environment within the community. The developers and the control committee are vested with powers to insure that the covenants and guidelines are followed by the community's membership. Focusing on that objective, the committee evaluated the placement of the four stone lightposts on the Montalbanos' property. No plans for the posts were submitted or approved by the committee. After considering the purpose for which they were erected, the committee concluded that they delineated the boundary line between the Montalbanos' lot and the community property, and that their massive size rendered them unsuitable for illuminating the entrances. Upon review of the evidence adduced at trial, we find that the committee properly exercised its judgment in interpreting the restrictive covenants. In accordance with the purpose, intent and language of the relevant covenants, the control committee determined that the placement of the stone columns delineated the boundary. The trial court's finding that the control committee properly exercised its judgment in keeping with the language of the restrictive covenants was consistent with the clear weight of the evidence presented.

The Montalbanos further claim that the Midwest Club

waived its right to enforce the restrictive covenants because the restrictions were arbitrarily enforced against them while not enforced against other violating homeowners. However, the existence of other minor violations does not necessarily establish a waiver. (*Watts v. Fritz* (1963), 29 Ill. 2d 517, 523; *The Knolls Association v. Hinton* (1979), 71 Ill. App. 3d 205, 209; *Rushing v. Camp* (1974), 19 Ill. App. 3d 435, 438.) In *Watts* our supreme court held:

> "Minor violations of a restriction will not prohibit the subsequent enforcement of it. [Citation.] However, where there has been acquiescence in prior violations of the very substance of a general plan or particular restriction, the plaintiff will be held to have waived any right he may have had to enforce it." (*Watts v. Fritz* (1963), 29 Ill. 2d 517, 523; see also *Mangini v. Oak Park Trust & Savings Bank* (1963), 43 Ill. App. 2d 318, 823.)

There is no evidence in this case of acquiescence of prior violations of a general plan. Rather, the evidence taken at trial indicates the Midwest Club and the control committee administered the architectural and landscaping controls professionally, using sound judgment and discretion. While the Montalbanos refer to four incidents of allegedly inconsistent decision, these incidents are distinguishable. The language of the restrictive covenants was clear and the architectural and landscaping decisions made by the control committee were based on well-reasoned value judgments rather than arbitrary or capricious whims. Thus, the Midwest Club did not waive its right to enforce the restrictive covenants. The trial court's finding was not against the manifest weight of the evidence.

■ The Montalbanos next contend that the Midwest Club expressly waived the declaration's restrictive covenant when the control committee approved their original plans and specifications. The restrictive covenant provides that all lots shall be used exclusively for single-family residences, and that no residences shall be permitted to conduct business of any kind. In support of their position, the Montalbanos rely on conversations between Anthony Montalbano and Robert Gaimari alleged to have occurred during negotiations for purchase of the lot. Since their testimony directly conflicted, the question of their credibility was resolved by the trial court. The trial court is in a far better position to determine the credibility of witnesses, and a court of review cannot substitute its judgment on these matters unless the findings are against the manifest weight of the evidence. (*E.g., Gibson v. State Farm Mutual Automobile Insurance Co.* (1984), 125 Ill. App. 3d 142, 150; *MBL (USA) Corp. v.*

*Diekman* (1983), 112 Ill. App. 3d 229, 235-36.) It is the province of the trial court as the trier of fact to resolve inconsistencies in testimony and to determine the credibility of witnesses. *MBL (USA) Corp. v. Diekman* (1983), 112 Ill. App. 3d 229, 235.

■ While the control committee approved the Montalbanos' plans, which indicated a private office and reception area, the committee never evaluated the use of the home's interior space. The committee's authority did not include evaluating the interior use of home space; the committee informed all prospective homeowners bringing plans for review of this limitation. The control committee's authority is limited to reviewing only the architecture and landscaping of plans submitted; it has no authority to approve the business use of a residence in violation of the restrictive covenant. Thus, the restrictive covenant cannot be said to have been waived by the committee. The trial court's findings as to the credibility of witnesses and the committee's nonwaiver of the restrictive covenant are not against the manifest weight of the evidence. Thus, its ruling on this issue will not be disturbed by this court.

The Midwest Club appeals the trial court's denial of attorney fees, claiming that since the declaration contained a provision requiring the payment of attorney fees and expenses to the trustees, if they prevail, the Midwest Club, as the prevailing party, is entitled to collect reasonable attorney fees. The provision in the declaration specifically authorizing attorney fees and expenses provides:

> "In any proceeding by the Trustees, based upon or arising out of an alleged default by an Owner, the Trustees, if prevailing, shall be entitled to recover all expense of the proceeding, including reasonable attorney fees."

■ The general rule in Illinois provides that apart from statute or agreement of the parties, a successful party is not entitled to recover attorney fees. (*Saltiel v. Olsen* (1981), 85 Ill. 2d 484, 488-89; *Losurdo Brothers v. Arkin Distributing Co.* (1984), 125 Ill. App. 3d 267, 274-75 (which effectively sets forth the standards for conducting a hearing to determine attorney fees and costs).) Provisions in contracts for awards of attorney fees and costs are an exception to this rule. (*Abdul-Karim v. First Federal Savings & Loan Association* (1984), 101 Ill. 2d 400, 411-12; *Saltiel v. Olsen* (1981), 85 Ill. 2d 484, 488; *Thornton v. Illinois Founders Insurance Co.* (1981), 84 Ill. 2d 365, 373; *Losurdo Brothers v. Arkin Distributing Co.* (1984), 125 Ill. App. 3d 267, 274-75; *Midwest Concrete Products Co. v. La Salle National Bank* (1981), 94 Ill. App. 3d 394, 398 (the appellate court reversed the trial court's ruling which denied the plaintiff's request for

attorney fees based upon a contractual provision similar to the one herein).) Thus, we conclude that attorney fees are recoverable herein since they are specifically authorized by contract, and it is error not to provide for them.

Notwithstanding the Midwest Club's right to attorney fees, the Montalbanos contend that since the use of their home to conduct a business was rendered moot by their voluntary cessation of such use, the award of fees should not include fees expended to prove that issue at trial. In *United States v. Concentrated Phosphate Export Association, Inc.* (1968), 393 U.S. 199, 21 L. Ed. 2d 344, 89 S. Ct. 361, the United States sought injunctive relief, and the defendant resisted on the ground that enactment of a new regulation made its operations uneconomical and that it therefore had dissolved itself, rendering the issue moot. In rejecting that argument, the court stated:

> "Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant *** free to return to his old ways.' [Citations.] A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. But here we have only appellees' own statement that it would be uneconomical for them to engage in any further joint operations. Such a statement, standing alone, cannot suffice to satisfy the heavy burden of persuasion which we have held rests upon those in appellees' shoes." (*United States v. Concentrated Phosphate Export Association, Inc.* (1968), 393 U.S. 199, 203, 21 L. Ed. 2d 344, 349, 89 S. Ct. 361, 364, citing *United States v. W. T. Grant Co.* (1953), 345 U.S. 629, 632-33, 97 L. Ed. 1303, 1309, 73 S. Ct. 894, 897.)

In *Concentrated Phosphate*, the court found defendant's statement, that it would be uneconomical to further engage in the activity, insufficient to render the injunction moot. In the instant case, this court is confronted with the Montalbanos' claim that more space was needed for the operation of their business.

■ The record reveals the Montalbanos operated their construction business from their residence between August 1981 and May 1983. On May 23, 1983, the Montalbanos filed the affidavit of Anthony Montalbano, which stated that after May 19, 1983, the business of Montalbano Builders would no longer be located in the Midwest Club and that "the move is necessitated because Montalbano Builders, Inc. requires additional space for its operations." Thereafter, the case proceeded to trial on October 25, 1983. On November

7, 1983, the Montalbanos filed a trial memorandum contending, *inter alia*, that the Midwest Club had waived the restriction against operating a business from the premises. Additionally, on appeal the Montalbanos assert that the Midwest Club has waived that restriction. Thus, although the Montalbanos ceased doing business from their home, they continued to claim the right to carry on their contracting business from their home by claiming waiver. This claim inescapably leaves open the possibility that the activity will recur. Thus, the Montalbanos' voluntary cessation of business and their claim of waiver of the restrictive covenant disallows the issue of "moot" status.

■ Further, the Montalbanos contend the Midwest Club's request for attorney fees must be denied because this appeal was not brought by a proper party. In support of their position, the Montalbanos rely on their motion to dismiss the appeal and attached memorandum filed in this court on May 25, 1984. This court denied the motion on June 7, 1984. The Montalbanos then moved for leave to file a reply to the Midwest Club's response to the motion to dismiss, and to reconsider this court's denial of the motion to dismiss. These motions were denied by this court on June 21, 1984. Thus, since the Montalbanos' contention has been previously considered and decided by this court, under the doctrine of *res judicata*, this court need not respond to the Montalbanos' contention herein.

We affirm the trial court's judgment except on the question of fees. The part of the judgment denying Midwest Club's attorney fees is reversed and remanded for a hearing to determine a reasonable attorney fee to be awarded Midwest Club.

Affirmed in part, reversed and remanded in part with directions.

UNVERZAGT and LINDBERG, JJ., concur.