2019 IL App (2d) 180325
No. 2-18-0325
Opinion filed March 29, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| LARRY STANDLEE, RONALD EDELMANN, and JOSEPH ARRAS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 17-CH-453 |
| JOSEPH BOSTEDT and EVA BOSTEDT, | ) ) ) | Honorable David R. Akemann, |
| Defendants-Appellants. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs, Larry Standlee, Ronald Edelmann, and Joseph Arras, filed a complaint to enjoin defendants, Joseph and Eva Bostedt,[1] from constructing a detached garage on their one-acre lot. There were no other detached garages in the subdivision. Plaintiffs claimed that a declaration of covenants for the subdivision, recorded in 1991, prohibited the garage. The trial court agreed and ordered that the Bostedts demolish their permit-approved, nearly completed, $50,000 garage. The Bostedts appeal, arguing that the court misinterpreted the declaration to contain an absolute ban on detached garages. They urge that the declaration did not set forth a

_____

[1] Because only Joseph testified, when we say "Bostedt," we mean Joseph.

blanket prohibition but, rather, contained a procedure for seeking a variance. However, because there was no trustee, committee, or association to approve a variance, they were denied the opportunity to seek one. We agree that the declaration contained a variance procedure and conclude that it that was no less a part of the declaration than the general restrictions. Because there was no access to the variance procedure, we will not enforce the restriction against the garage. This approach is consistent with the general principles to enforce restrictive covenants only when they are clear and to resolve any doubt in favor of property rights and the free use of land. We reverse.

¶ 2                                  I. BACKGROUND

¶ 3     In 2014, the Bostedts bought a home in the Williamsburg Green subdivision, in Elgin. The subdivision consisted of four platted units, Nos. 1, 2, 3, and 4. These units were platted between 1978 and 1990. Unit Nos. 3 and 4 together contain 95 lots. Approximately five empty lots remain. An exhibit with an aerial view of a portion of Unit No. 4, which contains the Bostedts' home, shows each lot to be approximately the same size, and one witness testified that her lot was one acre. Unit Nos. 3 and 4 share similar restrictions, which are set forth in two nearly identical declarations that cross-reference one another. They are dated 1986 and were recorded in 1991.

¶ 4                                  A. The Declaration

¶ 5     The developer named the First National Bank of Elgin as the trustee. The declaration governing Unit No. 4 reads, in pertinent part:

        "Whereas the Trustee [(the First National Bank of Elgin)] is the owner and holder

        of the legal title of the following described real estate ***: Lots 100 through 152

        inclusive in Williamsburg Green Unit No. 4 ***.

Whereas it is the desire of the Trustee to declare herein certain restrictions for the benefit of itself, subsequent owners, and mortgagees of the premises.

* * *

1. All the lots in the subdivision shall be used as residential lots. *No structure shall be erected, altered, placed, or permitted to remain on any residential lot other than a single family dwelling* not more than two stories in height. *Each such dwelling shall have an attached three or four car garage* with a paved driveway.

2. *** No bi-level dwelling will be permitted. *No masonry front only* dwelling will be permitted. Care must be taken with the design to make the side and rear of the dwelling compatible with the front. *Garage doors must not face to the front of the lot.* All chimney shall be of masonry construction. *Any improvements to be constructed are subject to the approval of the Trustee or a committee appointed by the Trustee and such approval must be in writing.* Exterior color selections shall also be subject to such approval.

3. *No buildings, fence, swimming pool, or other structures* shall be placed, erected, or altered on any lot *until *** [the specifications, the building plans, and] the plot plan showing the location of said [structure] shall have been approved in writing by the Trustee or by a committee appointed by the Trustee ***.* No above-ground swimming pool shall be permitted and any in-ground swimming pool must be surrounded by a fence, the fence to be approved in writing by the Trustee or a committee appointed by the Trustee.

* * *

7. No trucks, commercial vehicles, trailers, boats, or campers shall be stored or parked in yard or parked in drive or on streets overnight.

8. *No outbuildings or any other structures of any kind whatsoever shall be constructed on the real estate.* Any owner of real estate in Williamsburg Green Unit No. 4 acknowledges that the construction of any outbuildings will affect the appearance and general plan for development of [the subdivision] and that the enforcement of a remedy by way of injunction will not cause any hardship on such owner.

9. *Each owner of any lot in [Unit No. 4] shall automatically become a member of [the Unit No. 3] property owners' association* *** and the owner shall be subject to all the bylaws of the association ***.

10. *** Not more than one driveway from a public street is permitted on a lot, unless the lot has the minimum lot frontage of 150 feet along the same street ***. On lots where more than one driveway access to a public street may be provided, driveways shall be located at least 50 feet from the intersection of two street right-of-ways and at least 100 feet away from another driveway on the same lot." (Emphases added.)

¶ 6    Although the declaration refers to a trustee, a committee, and an association, none of these existed when the Bostedts purchased their home or at any time relevant to this case. A trustee, a committee, and an association have, at best, existed intermittently throughout the life of the subdivision. The Illinois Secretary of State website shows that an association was formed in 2001 but dissolved in 2002. There is no evidence of any trustee, committee, or association having existed after 2008, nine years before this lawsuit was filed. Plaintiffs concede that no trustee, committee, or association existed since the Bostedts purchased their home.

¶ 7    The Bostedts agree that, because the declaration was recorded, they had constructive notice of the subdivision's restrictions. However, they maintain that they did not have actual notice of the restrictions and that they pursued the construction of their garage in good faith. The Bostedts took title to their property pursuant to a recorded deed, but that deed did not reference any restrictions. They did not receive a copy of the title policy at closing, which would have alerted them to the restrictions. Instead, the title policy was mailed to their home shortly after the closing, along with several other documents. They did *not* read the documents and filed them away.

¶ 8                    B. The Garage and the Ensuing Controversy

¶ 9    On February 6, 2017, the Bostedts entered into a contract to construct a detached garage. By March 31, 2017, they had obtained the necessary approvals from Kane County, including a building permit. On April 8, 2017, they began construction. As detailed below, only one neighbor, John Graziadei, came to speak to the Bostedts about their garage. Graziadei did not take issue with it. The garage was to be built in the style of the main home, with the same color and pattern of brick in the front. The garage was also to have an identical rose window and complementary lanterns. It would store the Bostedts' collectors' cars, which included a Mustang, a Corvette, and a BMW. The contracted-for cost of the garage was $45,000, but the total cost to the date of the lawsuit was $50,000.

¶ 10    On April 26, 2017, Standlee returned home from Florida and noticed the construction. After speaking with a few neighbors, including Edelmann and Arass, Standlee wrote the Bostedts an anonymous letter urging them to cease construction or be subject to injunction proceedings.

¶ 11    The letter, dated May 1, 2017, stated:

"Enclosed is a copy of the Deed Restrictions that pertain to your lot. *** The garage you are building is not in compliance to the Deed Restrictions of this community and we as concerned neighbors are writing this letter to you as a courtesy. The Deed Restrictions will be enforced and it would be less costly for you to remove the garage now, before you put more money and effort into your project."

The letter was signed "concerned neighbors" and provided no contact information.

¶ 12 The Bostedts received the letter May 5, 2017, via the United States Postal Service. According to them, this was the first they had heard of a restriction against detached garages. By that date, the garage was already substantially completed. The foundation was in place, the garage was fully framed, the roof deck was complete, roofing paper had been applied, and siding had been applied to "two elevations of the structure."

¶ 13 On May 6, 2017, plaintiffs sent a second anonymous letter, again signed "concerned neighbors" and providing no contact information. This time, the letter warned that (in plaintiffs' view) the county permit was not valid and would be "red flagged" that week.

¶ 14 On May 10, 2017, plaintiffs sent a third anonymous letter, this time to all subdivision residents. The letter referred residents to an attorney and provided a generic e-mail address, entitled "Save Williamsburg Green," where residents could donate funds to be used in a legal action to stop the garage construction. Plaintiffs incorrectly represented that the Bostedts were planning to use the garage to house commercial vehicles, and they opined that

"without enforcement of our restrictions, any homeowner in [the subdivision] can build two accessory buildings, install a chain link fence, and store commercial vehicles on their property [(all actions allowed by the county)]. If we lose our rights, we will most definitely reduce the value of our homes here and make it harder to sell."

¶ 15                                    C. Pretrial Motions

¶ 16    On May 17, 2017, plaintiffs petitioned for both a preliminary and a permanent injunction. They alleged that the Bostedts' garage violated paragraphs 1, 2, and 8 of the declaration, which prohibited (1) structures other than single-family residences, (2) front-facing garages, and (8) outbuildings, respectively. They argued that, should the Bostedts be permitted to maintain their garage, plaintiffs would suffer irreparable harm, including but not limited to the diminution of their real estate, the interruption of their right to quiet enjoyment of their real estate, and the disruption of the appearance and general plan for the subdivision.

¶ 17    That same day, plaintiffs also moved for a temporary restraining order (TRO). The Bostedts answered and submitted two affirmative defenses: (1) waiver, in that (a) the declaration was unenforceable, because there was no committee and plaintiffs had allowed the association to dissolve, and (b) plaintiffs had acquiesced to violations of the same nature on other lots; and (2) *laches*, in that the Bostedts obtained a permit on March 31, 2017, and began open and notorious construction on April 8, yet no neighbor advised them of any impropriety until May 5—and even then without providing contact information—at which point the garage was substantially completed. The Bostedts later added a defense of unclean hands.

¶ 18    On May 22, 2017, the trial court denied the TRO. The court entered its order without prejudice, essentially stating that it needed to hear more evidence before granting any relief. It further advised that, if the evidence showed that the garage was substantially completed as claimed, then it would skip the question of a preliminary injunction and proceed to the ultimate question of a permanent injunction.

¶ 19    After the court denied the TRO, the Bostedts resumed work on the garage. According to them, they performed limited improvements for the sole purpose of preserving their investment

and satisfying their contractual obligations to the contractors. The new work included completing the siding and brick, adding roof shingles and an overhead door, pouring slab to prevent water intrusion, applying miscellaneous trim, and performing electrical work. However, the Bostedts stopped work on the driveway extension pending the resolution of the lawsuit.

¶ 20                          D. Trial: Plaintiffs' Case

¶ 21    Plaintiffs each testified, as did two neighbors, Gail Hanna and Pam Eggum. Plaintiffs and Hanna testified to similar points, while Eggum testified to her six-car garage.

¶ 22    Plaintiffs and Hanna each testified that the declaration's restrictions that sought to preserve open land were a reason that they chose to purchase in the Williamsburg subdivision. Standlee, who purchased five years ago, liked the large lots, the open land, and the absence of fences. Arras, who purchased 14 years ago, also enjoyed the "wide open spaces." Now, he could see the Bostedts' garage from his home, and he thought that it was "ugly." Edelmann, who purchased 12 years ago, found the subdivision "beautiful, wide open, nothing obstructing views, nothing to laugh at." Edelmann purchased his home with the understanding that he could not put up a shed or any other structure. Hanna, who purchased 18 years ago, liked the feel of the open land. Hanna lived across the street from the Bostedts. Although she recognized that "beauty is in the eye of the beholder," she believed that the Bostedts' garage detracted from the appearance of the property.

¶ 23    Plaintiffs and Hanna also testified to their concern that allowing the Bostedts' garage would "open the door" to other violations and decrease property values. Standlee testified: "I live by the rules that I inherit, part of why I purchased in that location. And I felt that somebody breaking the rules would affect the esthetic of the entire neighborhood." He further stated that the county's zoning ordinances were insufficient to preserve the subdivision's character, because

those ordinances would allow the construction of "a pole barn." He had "no doubt" that allowing the Bostedts' garage would "open the door" to the construction of similar buildings in the subdivision. Edelmann had heard other neighbors say that they hoped the Bostedts' garage "passes," so that they could put up a shed. These neighbors said that their garages were too small. Hanna worried that, if the garage were allowed, other neighbors would violate the declaration, such as by putting up chain-link fences. While Hanna did not mind certain violations, such as gazebos or detached playhouses, Arras believed that any violation would weaken the declaration and thereby decrease property values.

¶ 24    According to Standlee, the Bostedts should have had actual knowledge of the declaration, because, in late 2016, he sent them a "concerned neighbors" letter that attached a copy of the declaration. That letter addressed a commercial vehicle parked in front of the residence. Standlee acknowledged that he did not produce that letter in discovery. He stated that he typed it on his computer and would go home and look for it.

¶ 25    Plaintiffs addressed other alleged violations in the neighborhood. Edelmann did not believe that he had a masonry-front-only home. He acknowledged that he had brick on the front, between the windows. He also had brick on the back, with the chimney. The rest of the home was cedar.

¶ 26    According to Standlee, there were no more than four other violations in the subdivision and he did not ignore them. He became aware of them in conjunction with the instant lawsuit. He realized that he himself could be in violation of the declaration, because he landscaped his yard with garden planters. So, he removed them. Also, he learned of a pool house/gazebo owned by Graziadei, which we later address in greater detail. Further, as to a storage pod that had been in a neighbor's driveway for four months, Standlee eventually "took action," because:

"I felt I had to treat everyone equally. It is my understanding that the owner has kidney failure, and they needed space inside their home to move stuff out so they could put a machine in. I do speak to him regularly when he is moving around. They said they would move it. *** Obviously they didn't. So, I had to give them notice."

Standlee sent the owners of the storage pod a letter.

¶ 27    In conflict with his testimony that there were only four other violations, Standlee conceded that "a lot" of homes in the neighborhood had front-facing garages, which he considered to be a lower-quality design.

¶ 28    Standlee was aware that the Eggums had a six-car garage. However, he did not believe that the Eggums violated paragraph 1, which allowed only three- and four-car garages: "My understanding is that it's been there for over 20 years, was approved by the developers, and I don't believe it constitutes an issue with regard to the covenants and restrictions."

¶ 29    Eggum confirmed that a committee, known as Pace Construction, approved her six-car garage. The Eggums bought their lot in 2003 and had a home custom built. They submitted their blueprints to the committee. The entire property was subject to the committee's design-approval process. The Eggums were aware that the declaration allowed only three- and four-car garages. They specifically questioned the committee on the issue of their larger garage, and the committee approved it. Eggum recalled that the committee did not want owners to have garages for fewer than three cars; rather, the committee "wanted maximum design" for the houses and garages.

¶ 30    Arras, the only plaintiff to have bought an empty lot as opposed to an existing home, submitted to a design process similar to that of the Eggums. The committee, still Pace Construction, approved his design.

¶ 31                              E. Trial: The Bostedts' Case

¶ 32    Bostedt presented evidence of other violations throughout Unit Nos. 3 and 4. According to Bostedt, approximately one-third of the 95 homes were in violation of at least one restriction. Bostedt submitted pictures of many of these violations. Specifically, Bostedt noted one home with a six-car garage (the Eggums'), six homes with front-facing garages, two homes with masonry fronts only (including Edelmann's), two homes with fences but no pools (which disrupted the intended open-land feel), one home with a large storage pod, one home with a commercial vehicle/cement mixer in the driveway, one home with a trailer and watercraft in the driveway, and many homes with detached structures, ranging from basic sheds to large pergolas, playhouses, a garden railroad, and pool structures, including a newly disputed pool house/gazebo (Graziadei's). Also, several owners had built improvements or structures, including at least one entire home (Graziadei's), without submitting to a subdivision approval process.

¶ 33    Graziadei testified for the Bostedts. Graziadei and his wife bought a lot in the subdivision 11 years ago. They obtained permits from the county to build their home, but they did not go through any approval process with a committee or any representative from the subdivision. They heard rumors that there had been a process in the past. When they asked neighbors about the subdivision's approval process, they were told that the committee and association had disbanded years ago. The neighbors told them that the covenants were contained in an "old document." They "didn't know if it still applie[d], but, really, everybody's doing what they want to do." In eight months of open construction, not a single neighbor asked Graziadei whether his home complied with the restrictions. Not one neighbor asked about the size or orientation of his garage or whether he would build an outbuilding.

¶ 34    In fact, Graziadei was currently under contract to build a pool house/gazebo. He obtained a permit, but he did not seek subdivision approval. The plans were entered into evidence, but the dimensions are too blurry to read. The plans show that the building was to have a foundation, four walls, and a roof. Its exterior would complement the main house. It would have both a porch/seating area and a storage area.

¶ 35    When Standlee came to Graziadei's home to ask if Graziadei would join the complaint, Graziadei asked Standlee if Standlee "had a problem with" his pool house/gazebo. Standlee answered, "Between us? No. But I've got [an] issue with [the Bostedts' garage]." Graziadei was upset by Standlee's lack of uniform application, calling it an "integrity issue."

¶ 36    Graziadei did not know the Bostedts. However, when he noticed construction on the Bostedts' property, he asked Bostedt about it. Graziadei was pleased to hear that the garage exterior would match the style of the main home. He could see the garage from his home, and he did not believe that it would affect his property's value.

¶ 37    James Snorek testified for the Bostedts. Snorek bought an existing home in the subdivision seven years ago. In furtherance of his train hobby, he built a "significantly large" garden railroad, which was one of the premier garden railroads in the Chicago area, complete with a pond and water feature. He did not ask anyone's permission to build it, and no one ever complained. To the contrary, neighbors, including one of the plaintiffs, had asked to bring their grandchildren to see it.

¶ 38    Snorek did not think that the Bostedts' garage would impact property values. "I think its fine. It looks like it was there since the day the house was built."

¶ 39    Bostedt testified again, addressing Standlee's claim that, in late 2016, Bostedt was sent a copy of the declaration after he parked a commercial vehicle in the street. Bostedt explained

that, in *2015*, his son parked a tow truck in the street. His son worked for a tow truck company. Bostedt had been traveling for work, but, when he returned home, he told his son that the street was not a proper place to park. His son had not parked the tow truck in the subdivision since 2015. Bostedt did not receive a letter complaining of the tow truck, nor did he receive a copy of the declaration at that time. Bostedt had no intention of parking commercial vehicles in his garage. As previously stated, he intended to house collectors' cars.

¶ 40 Standlee was called as an adverse witness. Standlee had attempted to locate the 2016 correspondence concerning the commercial vehicle, but he could not find it. He admitted that, when he raised funds for the instant lawsuit and told neighbors that the Bostedts were going to store commercial vehicles in the garage, he did not really know that to be true. "It was a guess on my part."

¶ 41 Standlee was not sure whether Graziadei's pool house/gazebo violated the declaration. Standlee recounted his conversation with Graziadei:

"I told him I would bring the concept to counsel if he was to propose something to us. It may fall within the declarations. Whether we had the power to review it and approve it, I was not clear on it, but I would bring that subject up to the homeowners within Williamsburg Unit 4 and legal counsel."

¶ 42                                                 F. Trial Court's Ruling

¶ 43 The court ruled in favor of plaintiffs, and it ordered that the Bostedts' garage be removed. On the issue of interpretation, the court acknowledged:

"The declarations are not as clear as they might be and if read individually may appear to have different and conflicting prohibitions. Further, there are no definitions contained in the declaration and no testimony from the makers of the declaration and no

current homeowners association to speak on behalf of the owners. The absence of these items makes the construction more difficult."

¶ 44    The court addressed paragraph 3. Paragraph 3 was problematic, because it (1) conflicted with paragraphs 1 and 8 and (2) referenced a nonexistent trustee, committee, and approval process. Paragraph 1 prohibited all "structures" aside from single-family residences, and paragraph 8 prohibited "outbuildings" and "any other structures of any kind whatsoever," *but* paragraph 3 provided an approval process for "other structures." The court resolved this conflict by striking paragraph 3. Citing *Rosenburger v. United Community Bancshares, Inc.*, 2017 IL App (1st) 161102, ¶ 24 (explaining the doctrine of legal impossibility), it reasoned that, because there was no trustee, committee, or approval process, the provision should be stricken on the ground of legal impossibility.

¶ 45    With paragraph 3 stricken from the declaration, paragraphs 1 and 8 clearly set forth a *blanket prohibition* on outbuildings and "any other structures of any kind whatsoever." The court determined that a detached garage was an outbuilding, as an outbuilding is a "detached building (such as a shed or a garage) within the grounds of a main building." Black's Law Dictionary 1135 (8th ed. 2004). Further, the prohibition against any other structures meant that owners could not build *anything* on their lots.

¶ 46    Citing *Amoco Realty Co. v. Motalabano*, 133 Ill. App. 3d 327, 332 (1985) (a person in whose favor a restrictive covenant runs is *prima facie* entitled to seek its enforcement), the court concluded that the Bostedts' garage violated the declaration and that plaintiffs, as persons in whose favor the restrictive covenant ran, had a right to enjoin its construction.

¶ 47    The court next rejected the Bostedts' three affirmative defenses: waiver, laches, and unclean hands. We do not detail the court's ruling on these points, as it is not essential to our

analysis on appeal. The Bostedts filed a motion to reconsider, which the court denied. This appeal followed.

¶ 48                                II. ANALYSIS

¶ 49    The Bostedts appeal the permanent injunction against their garage. They argue that the trial court (1) misinterpreted the declaration and, therefore, erred in enforcing a blanket prohibition on outbuildings; (2) engaged in a faulty analysis when it failed to consider the equities before enforcing a blanket prohibition; and (3) improperly rejected their affirmative defenses. We agree with the Bostedts' first argument and reverse on those grounds.

¶ 50            A. Black-Letter Law Concerning Injunctions and Restrictive Covenants

¶ 51    A permanent injunction is appropriate when the plaintiffs show that they are suffering an irreparable, continuing harm and that there is no adequate remedy at law. *Gleicher, Friberg & Associates v. University of Health Sciences*, 224 Ill. App. 3d 327, 332 (1985). A trial court's factual findings as to these elements will not be reversed unless they were against the manifest weight of the evidence. *Helping Others Maintain Environmental Standards v. Bos*, 406 Ill. App. 3d 669, 688 (2010). These elements may be supplanted in certain circumstances, such as here, when a violation of a covenant alone is cause to enjoin the prohibited activity. See *County of Kendall v. Rosenwinkle*, 353 Ill. App. 3d 529, 539 (2004) (traditional elements supplanted where violation of statute alone warrants an injunction); *Amoco*, 133 Ill. App. 3d at 332 (a mere breach of a covenant is a sufficient ground to enjoin the violation). A traditional balancing of the harms is not appropriate where the parties to the covenant have defined harm for themselves as a breach of the agreed-upon mode of enjoyment of the land. *Cordogan v. United National Bank of Elgin*, 64 Ill. App. 3d 248, 253 (1978). Nevertheless, numerous cases, although not adopting a traditional balancing test in this context, refer to respective harms and equities in limited

circumstances. See, *e.g.*, *Westfield Homes, Inc. v. Herrick*, 229 Ill. App. 3d 445, 453 (1992) (Illinois has not expressly adopted a balancing test, but courts may consider whether a restriction is unreasonable under the circumstances); *Forest Glen Community Homeowners Ass'n v. Nolan*, 104 Ill. App. 3d 108, 113 (1982) (implying that considering respective harms and equities is appropriate when a defendant did not have "prior knowledge and direct notice" of the restriction); *Moore v. McDaniel*, 48 Ill. App. 3d 152, 165-66 (1977) (same).

¶ 52　The purpose of a declaration and restrictive covenant is to carry out a general scheme of improvement or development of real property. *Punzak v. DeLano*, 11 Ill. 2d 117, 119 (1957). Restrictive covenants do not supersede zoning ordinances; rather, whichever is the more restrictive of the two will prevail. *Wier v. Isenberg*, 95 Ill. App. 3d 839, 845 (1981). A restrictive covenant may be personal, or it may run with the land. *La Salle National Trust, N.A. v. Village of Westmont*, 264 Ill. App. 3d 43, 71 (1994). A covenant that runs with the land may be enforced against subsequent owners of the property. *Parrish v. City of Carbondale*, 61 Ill. App. 3d 500, 504 (1978). A covenant runs with the land if the covenantor and covenantee intended the covenant to run with the land, the covenant touches and concerns the land, and there is a privity of estate between the party claiming the benefit of the covenant and the party resting under the burden of the covenant. *Drayson v. Wolff*, 277 Ill. App. 3d 975, 983 (1996). Here, the declaration states that it is for the benefit of subsequent owners, and the parties do not dispute that it runs with the land.

¶ 53　Covenants that run with the land so as to be enforceable against subsequent owners are not necessarily of infinite duration. Rather, a covenant may specify its term, subject to renewal, amendment, or dissolution, automatically or by action. See, *e.g.*, *Scott v. York Woods Community Ass'n*, 329 Ill. App. 3d 492, 494 (2002). Also, a covenant, whether personal or

running with the land, may expire when the purpose it serves can no longer be implemented. *In re Estate of Wallis*, 276 Ill. App. 3d 1035, 1057 (1995). The processes set forth in the declaration by which a subdivision is to renew or amend its restrictions are no less a part of the declaration than the restrictions themselves. *Scott*, 329 Ill. App. 3d at 501. While certain processes might strike some as unwise or unduly rigid, owners rely upon them in selecting the community. *Id.*

¶ 54 "In recent years it has become increasingly common for the declaration of covenants to establish a homeowners association with the power to enforce the restrictive covenants" after a developer has ceased involvement in maintaining the common scheme. 4 Illinois Forms Legal & Business §11:57 (Aug. 2018) (Declaration of Covenants). The association may act on behalf of all homeowners. See, *e.g.*, *Scott*, 329 Ill. App. 3d at 494. Independent of an association, a person in whose favor a restrictive covenant runs is *prima facie* entitled to seek its enforcement. *Amoco*, 133 Ill. App. 3d at 332. Still, when an individual challenges a decision made by the association, a court will generally defer to the association's decision, so long as the association acted reasonably. See, *e.g.*, *Westfield Homes*, 229 Ill. App. 3d at 453. A party seeking to enforce a restriction must show that the property was purchased with actual or constructive notice of the restriction. *Village of Wadsworth v. Kerton*, 311 Ill. App. 3d 829, 840 (2000). Here, because the declaration was recorded, the parties do not dispute that the Bostedts had constructive notice.

¶ 55 When construing restrictive covenants in a declaration, the rules of contract interpretation apply. *Forest Glen Community Homeowners Ass'n v. Bishof*, 321 Ill. App. 3d 298, 303 (2001). The paramount rule of contract interpretation is to give effect to the intent of the parties. *Amoco*, 133 Ill. App. 3d at 331. The intent should be derived from the language of the document, read as

a whole and construed in connection with the circumstances surrounding its execution. *Chicago Title & Trust Co. v. Weiss*, 238 Ill. App. 3d 921, 925 (1992); *Amoco*, 133 Ill. App. 3d at 331. "[A] court cannot alter, change or modify the existing terms of a contract or add new terms or conditions to which the parties do not appear to have assented, write into the contract something which the parties have omitted, or take away something which the parties have included." *Szafranski v. Dunston*, 2015 IL App (1st) 122975-B, ¶ 81. Rather, the court has a duty to harmonize seemingly discordant provisions of a contract to avoid a construction that would render some of those provisions meaningless. *Gleicher*, 224 Ill. App. 3d at 86.

¶ 56 Restrictive covenants are not favored, and a covenant will be enforced only where the covenant is reasonable, clear, and definite. *Lakeland Property Owners Ass'n v. Larson*, 121 Ill. App. 3d 805, 810 (1984). Doubts and ambiguities will be resolved in favor of free use and against restrictions. *Amoco*, 133 Ill. App. 3d at 332. However, this generalization will not be applied to defeat the obvious purpose of a restriction. *Id*. at 331. As such, before resolving doubts in favor of free use and against restrictions, the court may turn to any aid, rule, or canon of construction to ascertain the parties' intent. *Id*. at 332. Parties' past performance on a contract is indicative of their intent. *Village of Palatine v. Palatine Associates, LLC*, 2012 IL App (1st) 102707, ¶ 45.

¶ 57 The trial court's interpretation of a contract is a matter of law, subject to *de novo* review. *Szafranski*, 2015 IL App (1st) 122975-B, ¶ 95. The determination of whether a contract is ambiguous, so as to allow the court to look to parol evidence to determine the parties' intent, is also reviewed *de novo*. *Shields Pork Plus, Inc. v. Swiss Valley Agricultural Service*, 329 Ill. App. 3d 305, 311 (2002). If the trial court turned to parol evidence to ascertain the parties' intent, we defer to its credibility and factual determinations unless they were against the manifest

weight of the evidence. *Keep Productions, Inc. v. Arlington Park Towers Hotel Corp.*, 49 Ill. App. 3d 258, 264 (1977).

¶ 58                    B. Original Intent to Establish a Variance Procedure

¶ 59    Here, the parties dispute whether the declaration intended a *blanket prohibition* against detached garages or whether it intended a *variance procedure* by which an owner could seek approval of an otherwise prohibited structure. To answer this question, we look to paragraphs 1, 3, and 8:

> "1. All the lots in the subdivision shall be used as residential lots. *No structure* shall be erected, altered, placed, or permitted to remain on any residential lot *other than a single family dwelling* not more than two stories in height. Each such dwelling shall have an *attached three or four car garage* with a paved driveway.
>
> * * *
>
> 3. *No* buildings, fence, swimming pool, or *other structures* shall be placed, erected, or altered on any lot *until * * * [the specifications, the building plans, and] the plot plan showing the location of said [structure] shall have been approved in writing by the Trustee or by a committee appointed by the Trustee * * *. * * *
>
> * * *
>
> 8. *No outbuildings or any other structures of any kind whatsoever* shall be constructed on the real estate. Any owner of real estate in Williamsburg Green Unit No. 4 acknowledges that the construction of any outbuildings will affect the appearance and general plan for development of [the subdivision] and that the enforcement of a remedy by way of injunction will not cause any hardship on such owner." (Emphases added.)

¶ 60    At first blush, it appears that paragraph 3 conflicts with paragraphs 1 and 8.  Paragraph 1 prohibits all "structures" aside from single-family residences, and paragraph 8 prohibits "outbuildings" and "any other structures of any kind whatsoever," *but* paragraph 3 provides an approval process for "other structures."  However, it *is* possible to harmonize paragraph 3 with paragraphs 1 and 8 if we interpret paragraph 3 to establish a variance procedure by which generally prohibited structures may nevertheless be allowed.  When possible, it is our duty to harmonize seemingly discordant provisions.  *Gleicher*, 224 Ill. App. 3d at 86.

¶ 61    Here, the owners' and, when it existed, the committee's early performance on the declaration supports the existence of a variance procedure.  For example, the committee granted the Eggums a variance for their six-car garage.  Paragraph 1 expressly mandated only three- and four-car garages.  Thus, in approving the Eggums' six-car garage, the committee demonstrated not only its authority to approve a design, but also its authority to grant a variance.  The committee's past performance is indicative of the declaration's intent.  See, *e.g.*, *Palatine*, 2012 IL App (1st) 102707, ¶ 45.  As such, the committee's grant of a variance to the Eggums supports our interpretation that paragraph 3 establishes a variance procedure.

¶ 62    We reject the trial court's rationale in support of a blanket prohibition.  The trial court struck paragraph 3 under the doctrine of legal impossibility.  It reasoned that paragraph 3 delineated a procedure to be conducted by a trustee or a committee but that, currently, there was no trustee or committee.  (Also, there was no association, and an association is typically charged with enforcing a declaration after the developer is no longer involved in maintaining the common scheme.)  Without paragraph 3, paragraph 8's prohibition against other structures unambiguously constituted a blanket prohibition against the same.

¶ 63   However, the trial court violated the rules of contract interpretation, because it cannot simply strike an inconvenient provision. *Szafranski*, 2015 IL App (1st) 122975-B, ¶ 81. The doctrine of legal impossibility does not permit a court to strike a provision when interpreting a contract. Indeed, the doctrine applies not to contract interpretation but to contract performance. *Rosenburger*, 2017 IL App (1st) 161102, ¶ 24.

¶ 64   We also reject plaintiffs' rationale in support of a blanket prohibition:

> "That a trustee or committee appointed by the trustee is charged in paragraph 3 of the Declaration with approving plans for construction and placement of buildings and structures on a lot does not mean the trustee or committee appointed by the trustee would be legally entitled to grant approval to a structure that is expressly prohibited by the terms of paragraphs 1, 2, or 8 of the Declaration. Rather, *** paragraph 3 charges the trustee or committee appointed by the trustee with the duty and authority to approve the construction of buildings or other structures that are permitted by the express provisions of the Declaration."

According to plaintiffs, paragraph 3 establishes not a variance procedure but merely a design-approval process by which the committee can oversee projects that are already allowed by the declaration.

¶ 65   Plaintiffs' interpretation is strained. Unlike our interpretation, it fails to explain how paragraph 8's ban on "other structures of any kind whatsoever" can be harmonized with paragraph 3's approval process for "other structures." We conclude that the declaration intended for owners to have access to a variance procedure.

¶ 66      C. Enforcement of Restriction Absent Access to Intended Variance Procedure

¶ 67    We consider whether, when it is impossible to perform the intended variance procedure, the owners simply are bound by the general restriction against outbuildings and other structures. We reject this approach.  We cannot see how an owner can be bound by a restriction where he has lost the intended benefit of the ability to seek a variance from that same restriction.

¶ 68    A variance procedure is a significant benefit.  Such a procedure set forth in a declaration can be as important as the restrictions themselves.  *Scott*, 329 Ill. App. 3d at 501.  Owners rely on that procedure in choosing a community.  *Id*.  Owners with constructive notice of the declaration agree not only to the restrictions but also to the procedure by which the restrictions would be implemented or waived.  The committee was entrusted to make decisions, and the association was intended to maintain the shared community.  Placing the decision-making process with an organized body increases the likelihood of consistent and well-reasoned decisions based on collective judgment.  Any individual owner unhappy with a decision could communicate with and/or litigate against the organized body, whose decision would be entitled to deference and, thus, graced with stability.

¶ 69    In contrast, without a variance procedure, individual owners cannot seek a variance.  As here, a complaint might arise postconstruction and by only a few members of the community. Also as here, the complaint might arise without professional communication and based on false assertions.  (As noted, here, Standlee provided the Bostedts with no contact information and received funds for the lawsuit by "guessing" that the Bostedts would store commercial vehicles in their garage.)    Other violations with equal or greater impact on property values, even if different in character and, thus, *arguably* insufficient to substantiate a waiver defense—such as masonry-only fronts, pool houses, or entire homes built without subdivision approval—might go unnoticed or unremedied, undermining the force of the declaration.  A reasonable person might

be willing to buy into a community with a restriction against outbuildings and any other structures, but not into a community without an orderly process for implementing, waiving, renewing, or amending the restriction. For these reasons, the variance procedure has real value. When deciding whether to enforce a restriction against outbuildings and any other structures absent access to the intended variance procedure for that very same restriction, we must resolve any doubt in favor of the free use of land and against the restriction. *Amoco*, 133 Ill. App. 3d at 332.

¶ 70 We do not broadly decide how the absence of a committee or an association affects the viability of the declaration moving forward. We do briefly note that, in *Scott*, this court chose not to invalidate an entire declaration where the organizational structure it required had lapsed *inadvertently* for 15 years. *Scott*, 329 Ill. App. 3d at 500. Instead, we gave the community a "reasonable" amount of time to reorganize. *Id*.

¶ 71 Here, our holding is narrow in that we address only the viability of the restriction against outbuildings and any other structures. We will not enforce this restriction when the Bostedts were denied access to the intended variance procedure, by which they might have gained approval for the structure. Under these circumstances, the Bostedts may keep their nearly completed garage.

¶ 72 In sum, we have determined that the declaration's original intent was to provide owners with a variance procedure. This interpretation is consistent with the principle that we must harmonize seemingly discordant provisions of the declaration. It is also consistent with owners' past performance on the declaration, before the committee dissolved. We will not enforce a restriction when there is no access to the promised variance procedure for that very same restriction. Case law supports that the variance procedure set forth in a declaration is as

important as the restrictions themselves. Our approach is also supported by the general principle to resolve any doubt in favor of the free use of land and against the restriction. The Bostedts may keep their garage. Given our ruling, we do not address their alternate arguments.

¶ 73                                    III. CONCLUSION

¶ 74    For the aforementioned reasons, we reverse the trial court's judgment.

¶ 75    Reversed.