**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 220515-U

Order filed February 26, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| VILLAGE OF ELWOOD, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-22-0515 |
| | ) | Circuit No. 19-MR-596 |
| LB ANDERSEN LAND HOLDING, LLC | ) | (cons. with No. 19-CH-817) |
| and EAST GATE-LOGISTICS PARK | ) | |
| CHICAGO, LLC, | ) | Honorable |
| | ) | Theodore J. Jarz, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE HETTEL delivered the judgment of the court.
Justices Brennan and Davenport concurred in the judgment.

**ORDER**

¶ 1   *Held*: Trial court erred in entering summary judgment in favor of developers and against village where unambiguous terms of the annexation agreement did not require village to assist developers in the construction of a bridge.

¶ 2   Plaintiff, Village of Elwood (Elwood), filed a complaint seeking a declaration that it owed no duty to assist developers LB Andersen Land Holding, LLC (LB Andersen) and East Gate-Logistic Park Chicago, LLC (East Gate) (collectively, defendants) in constructing a bridge

over a railway pursuant to an annexation agreement (Annexation Agreement) to develop nearby property. The parties filed cross-motions for summary judgment. The trial court granted judgment in favor of defendants, declaring, in part, that the agreement imposed a duty on the village to execute documents required to build the bridge, and Elwood appeals. We reverse the trial court's order granting summary judgment in defendant's favor and denying judgment for Elwood and enter judgment in favor of Elwood.

¶ 3                                              I. BACKGROUND

¶ 4        In 2000, CenterPoint Intermodal LLC and CenterPoint Properties Trust (collectively, CenterPoint) commenced development of CenterPoint Intermodal Center (CIC) in Elwood. CIC is located west of Illinois State Route 53 (Route 53) and east of Interstate 55. It serves as the Midwest transportation hub for shipment of goods by rail and tractor-trailers, offering rail-terminal facilities, distribution centers, and logistic centers. Deer Run Industrial Park is a commercial distribution and logistics center within the intermodal complex.

¶ 5        In October 2001, Elwood petitioned the Illinois Commerce Commission (Commission) to permit a roadway crossing of the Union Pacific Railroad Company (Union Pacific) railroad tracks, which run parallel to Route 53. The petition requested a permit to construct an "at-grade" (*i.e.*, ground level) railroad crossing on the eastward extension of the roadway from the intermodal complex to Route 53. In its petition, Elwood stated that the extension of the road was "vitally needed to accommodate the moderately large volumes of vehicle and truck traffic anticipated to be generated" by CenterPoint's intermodal complex.

¶ 6        The Commission granted the petition and ordered that an at-grade crossing be constructed. The roadway extension was built shortly thereafter and named Walter Strawn Drive. The railroad crossing on the new roadway was completed in 2004. At that time, Walter Strawn

2

Drive ended at Route 53, creating a T-intersection a short distance to the east of the railroad crossing (circled below).



*Intersection*

*Map (Annotated): Exhibit A-71 of Elwood's Amended Motion for Summary Judgment*

¶ 7　　　　In May 2007, CenterPoint entered into an Annexation Agreement with Elwood to annex approximately 288 acres east of Route 53 (referred to as the CIC-East Addition). The recitals contained in the agreement's preamble provided:

> "WHEREAS, the parties have agreed that the Subject Property shall be annexed to and zoned by the Village so as to permit the construction of the CIC-East Addition to the Deer Run Industrial Park and to permit certain industrial, commercial and other business uses and residential uses.

* * *

WHEREAS, [CenterPoint] has filed with the corporate authorities of the Village an Application for Map Amendment and Concept Plan Amendment Approval in proper form requesting that approximately 261 acres of the Subject Property be zoned as I-4 Large Scale Industrial Development District (Category B), as an extension of and addition to the Deer Run Industrial Park ***."

¶ 8　　The general provisions of the agreement stated that CenterPoint would develop the property in conformity with the Concept Plan and development criteria. In relevant part, CenterPoint agreed to construct all public and private roadways as required by the Illinois Department of Transportation (IDOT) at its own expense. Specifically, section 18(B) stated:

"B. Intersection Improvements. Owner shall, at its sole expense, make all roadway and intersection improvements (including but not limited to signage, pavement markings, taper lanes and turn lanes) as may be required by the Illinois Department of Transportation ("IDOT") in order to extend Strawn Road across Illinois Route 53 and eastward into the Subject Property and in order to complete the new intersection of Strawn Road and Hoff Road in accordance with the Concept Plan Amendment. Subject to the review and approval of the Village with respect to design and construction plans and requirements, Owner shall also at its expense complete the construction of Strawn Road within the Subject Property in accordance with the Concept Plan Amendment. The Village agrees to execute any documents reasonably required or deemed desirable by Owner to apply for and obtain any necessary IDOT permits."

The agreement included a 20-year term and a good-faith clause in section 47, stating that the parties agreed "that the successful consummation of this Agreement requires the continued cooperation and best efforts of all parties."

4

¶ 9    The Concept Plan attached to the agreement contained an amended map (Exhibit EE) of the CIC-East Addition and downtown business developments as contemplated by the parties. It depicts Route 53, Walter Strawn Drive east of Route 53, Ira Morgan Drive west of Route 53, and a four-way intersection at the juncture of all three roadways (circled below). The map, attached below, shows an extension that crosses Route 53 and continues southeast along Ira Morgan Drive to a new intersection with Hoff Road.



*Concept Plan Map (Annotated): Attached to Annexation Agreement as Exhibit EE*

¶ 10    In 2010, CenterPoint finished construction of Ira Morgan Drive east of Route 53 and connected it to the already existing T-intersection at Walter Strawn Drive and Route 53. IDOT approved a four-way intersection with traffic lights, and by the end of 2010, the intersection was accessible to vehicles traveling in all directions.

¶ 11    On November 22, 2013, Commission staff filed a motion to re-open the Commission proceedings regarding the at-grade railroad crossing near the intersection of Walter Strawn Drive/Ira Morgan Drive and Route 53. The motion stated that the volume of truck traffic over the crossing had significantly exceeded projections and that funeral processions into the Abraham Lincoln National Cemetery created significant public safety concerns that could not be addressed by the warning system that existed at the crossing. In the motion, staff cited numerous safety and operational concerns and requested that detailed studies be conducted to determine a long-term solution to the issues associated with the increased traffic.

¶ 12    The Commission granted the motion and held an evidentiary hearing. At the hearing, several solutions were suggested, including a "grade-separated" crossing (*i.e.*, a bridge) that would span from Walter Strawn Drive to Ira Morgan Drive. The bridge would go over the Union Pacific tracks and Route 53.

¶ 13    On January 14, 2015, the Commission entered a temporary order closing the at-grade railroad crossing on Waltner Strawn Drive and ordered IDOT to complete a feasibility study regarding possible solutions to the public safety concerns. In September 2016, IDOT moved to permanently close the crossing and to close the Commission proceedings on the basis that broader scoped traffic studies were beyond the jurisdiction of the Commission, whose jurisdiction is limited to rail safety.

¶ 14    On March 20, 2017, CenterPoint deeded several lots in the CIC-East Addition to LB Andersen. Two months later, on May 10, the Commission entered an order permanently closing the railroad crossing. The order stated that Union Pacific, Elwood, and Will County had no objection to permanently closing the crossing and that CenterPoint took no position on the issue. Shortly after the ordered closing, all crossing materials were removed and concrete barricades

6

were placed at the intersection to prevent traffic from turning and proceeding west on Walter Strawn Drive.

¶ 15      During this time, Elwood began negotiations with East Gate, a commercial development company and the sole shareholder of LB Andersen, to annex 675 acres east of Route 53. In its proposal, East Gate included provisions for a bridge over Route 53 and the Union Pacific railroad crossing to gain access to CIC terminals west of Route 53 and agreed to pay for its construction. Elwood declined East Gate's proposed agreement.

¶ 16      In February 2018, East Gate filed a petition with the Commission seeking a permit to construct a bridge over the Union Pacific crossing, connecting Walter Strawn Drive and Ira Morgan Drive. In its petition, East Gate proposed a crossing without ingress or egress to Route 53 that was designed to send trucks from the CIC East Addition to the east of Route 53 over a bridge via Ira Morgan Road to Walter Strawn Drive to the west of Route 53 in a closed loop. East Gate's proposal eliminated the four-way intersection at Walter Strawn Drive and Route 53.

¶ 17      After filing the petition, East Gate learned that Commission regulations required Elwood to sign the petition. See 92 Ill. Adm. Code 1535.602. In response, defendants sent a letter to Elwood requesting that the village: (1) execute documents necessary to become the petitioner in the petition before the Commission for a grade-separated crossing; (2) file an amended petition; and (3) diligently prosecute the amended petition to allow East Gate to build a bridge at its own expense. Elwood declined and refused to sign the petition, claiming that it was not obligated to do so under the Annexation Agreement.

¶ 18      On March 1, 2019, Elwood filed a complaint for declaratory judgment (case No. 19-MR-596), asking the court to declare: (1) "[t]hat the village of Elwood had performed its obligations under the annexation agreement in regards to the intersection improvements at Walter Strawn

Drive and Illinois Route 53[;]" and (2) "[t]hat the annexation agreement does not require the Village of Elwood to assist and/or cooperate with Defendants in constructing a bridge at Walter Strawn Drive and Illinois Route 53." On April 19, 2019, defendants filed a breach of contract claim (case No. 19-CH-817) against Elwood, claiming the village violated the terms of the Annexation Agreement by failing to execute a petition to the Commission for a bridge crossing the Union Pacific tracks. The two cases were consolidated by the circuit court.

¶ 19        After two years of litigation, Elwood filed a motion for summary judgment, asking the court to declare that the Annexation Agreement did not impose a duty upon the village to: (1) execute any document with the Commission concerning a bridge; (2) prosecute any action in any forum regarding a bridge; (3) advocate for a bridge; or (4) consent to the construction of a bridge. Defendants filed a response and cross-motion for summary judgment, claiming that Elwood had a duty to cooperate with plans for a bridge under the terms of the Annexation Agreement and, to the extent it was ambiguous, summary judgment was inappropriate.

¶ 20        On October 20, 2021, the trial court entered judgment in favor of defendants on the first three declaratory requests but reserved ruling on the fourth. The court noted that with respect to the second request—the duty to prosecute any action in any forum—it appeared that the Commission's decision to close the intersection could be reopened by motion of either party.[1]

¶ 21        Elwood filed a motion to reconsider and to rule on the reserved issue. Following a hearing on that motion, the trial court issued a supplemental modified order denying Elwood's request for declaratory judgment as to the first three issues. Once again, the court reserved

_____

[1] Following its October 20, 2021, ruling, the circuit court entered a Rule 304(a) finding. Elwood appealed and filed a motion before this court claiming that we lacked jurisdiction because the trial court's order was not a final and appealable order as to all issues. We agreed and entered a minute order dismissing the appeal. *Village of Elwood v. LB Andersen Land Holding, LLC, et al.*, No. 3-21-0512 (Nov. 30, 2021).

8

judgment on the fourth issue and stated, "[W]ith respect to request number 4, the Village must consent to the construction of a bridge if it is otherwise approved by the [Commission] and [IDOT]." The court also encouraged defendants to file a motion to reopen the proceedings with the Commission.

¶ 22    Thereafter, LB Andersen and East Gate, as CenterPoint's successors in interest, filed a motion with the Commission to reopen the 2017 closure proceedings. The administrative law judge (ALJ) recommended denial of the motion, finding defendants were not a proper party to seek construction of a bridge. See 92 Ill. Adm. Code 1535.602 ("Petitioner for permission from this Commission for the construction of such subway or viaduct shall be the interested railroad company or a public officer or public body having authority to extend, or cause to be extended, the highway as proposed.") The Commission agreed with the ALJ's recommendation and denied defendants' motion.

¶ 23    The parties returned to the circuit court and filed cross-motions for summary judgment, requesting final judgment on all issues. On November 29, 2022, the trial court issued an order granting summary judgment in favor of defendants and denying summary judgment for Elwood. In relevant part, the court held:

> "The Village of Elwood, in accordance with this Court's prior ruling and the provisions cited in the Annexation Agreement, shall execute and submit to IDOT a petition seeking their determination as to the feasibility and appropriate concerns for the construction of the bridge connecting Walter Strawn Road to Ira Morgan Road across Route 53, on the understanding that all design engineering and construction costs are to be paid by LB Anderson [*sic*] as previously represented to this court. In submitting the petition, the Village of Elwood is not required to advocate for the construction of the

9

bridge and is free to exercise all its discretion not otherwise determined by its obligations under the Annexation Agreement. If IDOT then determines or rules that the issue must first be brought to the [Commission] then the same or another necessary petition shall be submitted by the Village of Elwood to the [Commission]."

¶ 24   On December 1, 2022, the trial court ruled that its November 29 order disposed of all issues raised in Elwood's declaratory judgment complaint and was final and appealable under Illinois Supreme Court Rule 304(a) (eff. March 8, 2016).

¶ 25                                   II. ANALYSIS

¶ 26   On appeal, Elwood contends that the trial court erred in granting judgment in favor of defendants because the unambiguous terms of the Annexation Agreement do not impose a duty to assist defendants or execute documents allowing defendants to construct a bridge over the railroad crossing near the Walter Strawn Drive and Route 53 intersection.

¶ 27   Summary judgment is appropriate where the pleadings, depositions, and affidavits on file establish that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Direct Energy Business, LLC v. City of Harvey*, 2021 IL App (1st) 200629, ¶ 14 (citing 735 ILCS 5/2-1005(c) (West 2020)). In declaratory judgment actions, summary judgment is appropriate where the only question for the trial court to consider is the legal interpretation of the parties' contract. *Bright Horizons Children's Centers, LLC v. Riverway Midwest II, LLC*, 403 Ill. App. 3d 234, 246 (2010). On appeal, we review an order granting summary judgment *de novo*, which means we perform the same analysis that a trial judge would perform. *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43.

¶ 28   Illinois courts follow the "four corners" rule when interpreting contracts:

10

"An agreement, when reduced to writing, must be presumed to speak the intentions of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." (Internal quotation marks omitted.) *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999).

Accordingly, the rules of construction require that a clear and unambiguous contract term be given its plain and ordinary meaning. *Chiurato v. Dayton Estates Dam & Water Co.*, 2017 IL App (3d) 160102, ¶ 28.

¶ 29    In interpreting an annexation agreement, the basic rules of contract interpretation apply. *Reserve at Woodstock, LLC v. City of Woodstock*, 2011 IL App (2d) 100676, ¶ 39. The main objective is to determine and give effect to the intention of the parties at the time they entered into the agreement. *Bright Horizons Children's Centers*, 403 Ill. App. 3d at 247. In determining the intent of the parties, the court must look to the instrument itself, its purpose, and the circumstances surrounding its execution. *Id.*

¶ 30    "When a dispute exists between the parties as to the meaning of a contract provision, the threshold issue is whether the contract is ambiguous." *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill. App. 3d 456, 469 (2004). Whether ambiguity exists is a question of law for the trial court. *Meyer v. Marilyn Miglin, Inc.*, 273 Ill. App. 3d 882, 888 (1995). A contract is ambiguous if the language employed is susceptible to more than one reasonable meaning or is obscure in meaning through indefiniteness. *Meyer*, 273 Ill. App. 3d at 888. A contract is not ambiguous, however, if its meaning can be ascertained from the general language of the agreement. *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 334 (2005). Terms in a contract are not rendered ambiguous merely because the parties do not agree on their

11

meaning. *Bright Horizons Children's Centers*, 403 Ill. App. 3d at 247. In the absence of ambiguity, a court must construe a contract according to its own language, not according to the parties' subjective constructions. *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748 (1990). Unless a word is specifically defined in an agreement, courts must give that term "its plain, ordinary, and popular meaning, *i.e.*, we look to its dictionary definition." *West Bend Mutual Insurance Co. v. Krishna Schaumberg Tan, Inc.*, 2021 IL 125978, ¶ 38.

¶ 31                                    A. Section 18(B)

¶ 32        In this case, the controlling provision of the Annexation Agreement, as both parties agree, is section 18(B). Section 18(B), provides:

> "Intersection Improvements. Owner shall, at its sole expense, make all roadway and intersection improvements (including but not limited to signage pavement markings, taper lanes and turn lanes) as may be required by [IDOT] in order to extend Strawn Road across Illinois Route 53 and eastward into the Subject Property."

¶ 33        The language, here, is straightforward and outlines the parties' obligations in unambiguous terms. First, the title itself plainly states that section 18(B) governs improvements to the "Intersection." The agreement does not define that term. The plain meaning of an intersection is "a place or area where two or more things (as streets) intersect." Merriam-Webster's Collegiate Dictionary 655 (11th ed. 2020). A bridge is not an intersection. A bridge may cross over an intersection, but the plain and ordinary meaning of the word does not include an intersection. See Merriam-Webster's Collegiate Dictionary 154 (11th ed. 2020) (a bridge is "a structure carrying a pathway or roadway over a depression or obstacle"). A bridge is not

12

commonly found where two or more roadways intersect. Thus, the title of section 18(B) does not include a bridge.

¶ 34    Second, the plain language within section 18(B) does not impose a duty to assist in constructing a bridge. The terms in the first sentence of section 18(B) refer to "roadway and intersection improvements" as may be required "to *extend* Strawn Road *across* Illinois Route 53." To extend means "to stretch" or "to cause to be longer." See Merriam-Webster's Collegiate Dictionary 442. And the term "across" is used to define a line that intersects another line. See Merriam-Webster's Collegiate Dictionary 655 (11th ed. 2020) (defining to "intersect" as "to pierce or divide by passing through or across"). The parenthetical phrase listing improvement is also unambiguous. It references pavement markings, lane markings, and turn lanes, which are typical features of an intersection.

¶ 35    Last, at the conclusion of section 18(B) it states that "[t]he Village agrees to execute any documents reasonably required or deemed desirable by [defendants] to apply for and obtain any necessary IDOT permits." This language is equally straightforward. It provides that defendants have an obligation to construct intersection improvements as may be required by IDOT and that Elwood has a duty to execute any documents required to obtain IDOT permits. IDOT exercises jurisdiction over intersection construction on State highways through municipalities (605 ILCS 5/4-101 to 4-110 (West 2022)), whereas the Commission has sole jurisdiction over railway crossings and viaducts (92 Ill. Adm. Code 1535.602).

¶ 36    Applying the plain and ordinary meaning of these words in light of the circumstances at the time the parties entered the Annexation Agreement, we conclude that the language within section 18(B) is unambiguous. CenterPoint and Elwood only agreed to make Walter Strawn Drive longer (i.e., *extend* Strawn Road) by adding a roadway or an intersection extension from

13

Route 53 to the east. Nothing in the language utilized in section 18(B) suggests that a bridge was required to extend the roadway eastward into the CIC-East Addition.

¶ 37    We find defendants' argument that it is "possible" to extend Walter Strawn Drive across Route 53 with roadway improvements in the form of a bridge to be unavailing. Not only does it ignore the coordinating conjunctive phrase "and eastward into the [CIC-East Addition]," it fails to address the plain and unambiguous terms utilized in the parties' agreement. Noticeably absent from section 18(B)'s plain language is any use of the word "bridge." See *J.M. Beals Enterprises*, 194 Ill. App. 3d at 749 (agreement's complete silence as to retrospective insurance premiums required court to apply fair and reasonable interpretation based on unambiguous contract terms). A party's argument that another interpretation is possible does not render an agreement ambiguous. *Id.*

¶ 38    In the alternative, defendants contend the parties' failure to mention a bridge in 18(B) is irrelevant, citing *Bright Horizons Children's Centers*, 403 Ill. App. 3d at 251-52 (*Bright Horizons*). In that case, the court was confronted with the issue of whether a lease allowed a tenant to be moved from a ground floor space to the second floor. According to the lease, the sole "permitted use" for the leased space was a "Child-care center for children." The lease also provided that the tenant agreed to operate the childcare center as a reputable operation "licensed by the Illinois Department of Children and Family Services [(DCFS)]" and in accordance with "any material DCFS regulations." *Id.* at 236. At the time the parties entered the lease, DCFS licensing standards required infants and toddlers to be cared for and housed on the ground level. The reviewing court held that the relocation clause in the lease did not allow for the landlord to move the childcare center to the second floor. The court reasoned that, although the ground floor was never mentioned in the lease, such a requirement existed because the lease allowed only one

14

permitted use—childcare services—and the lease specifically required Bright Horizon's to be licensed by DCFS and comply with its regulations. *Id.* at 252.

¶ 39     *Bright Horizons* is easily distinguishable. Here, section 18(B) does not refer to any regulation regarding the construction of a separate-grade crossing nor does it mention any agency regulations regarding bridge construction. More important, unlike the lease in *Bright Horizons*, the Annexation Agreement does not specify that the operation of the agreement depends on obtaining a permit from the Commission or complying with Commission rules.

¶ 40     Defendants further argue that the phrase "including but not limited to" in the first sentence of section 18(B) expands the meaning of intersection improvements to include a bridge. Again, defendants' interpretation is strained. The doctrine of *ejusdem generis* is a cardinal rule of contract construction. *West Bend Mutual Insurance Co. v. Krishna Schamburg Tan, Inc.*, 2021 IL 125978, ¶ 57. By definition, the doctrine provides that "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." Black's Law Dictionary 594 (9th ed. 2009). Translated from Latin, the phrase literally means "of the same kind or class." *Id.* Under the *ejusdem generis* doctrine, where a clause describes something and then provides examples using the phrase "included but not limited to," the other things listed are interpreted as meaning "other of the same kind" or "other such like." See *City of Chicago v. Elm State Property* LLC, 2016 IL App (1st) 152552, (interpreting a list of items following the term "including but not limited to" in the city's municipal code as describing "other things" granting ownership or control over property; thereby rejecting the city's argument that an assignment of a mortgage, while not specifically listed, was included).

¶ 41    Thus, to prevail on its argument that a bridge is included under the "not limited to" language, defendants must demonstrate that a bridge is the same as, or similar to, things like signs, payment markings, taper lanes, and turn lanes. Roadway signs, pavement markings, tapered lanes, and turn lanes are required for traffic that is turning or merging—necessary features of an intersection. By contrast, a bridge is "a structure carrying a pathway or roadway over a depression or obstacle." See Merriam-Webster's Collegiate Dictionary 154 (11th ed. 2020). Simply put, a bridge is not the same as, or similar to, the basic components of an intersection.

¶ 42    In this case, the disconnect between the definition of an intersection and a bridge, the parties' lack of reference to a bridge, and the enumerated list of intersection components, lead this court to conclude that a bridge does not fall into the category of "roadway and intersection improvements" under the plain language of section 18(B).

¶ 43                          B. Whole Annexation Agreement

¶ 44    Looking at the agreement as a whole leads to the same interpretation. Nowhere in the 32-page Annexation Agreement do the parties use the term "separation grade crossing," "separate-grade crossing," or "bridge." Moreover, a bridge design is not included in the Concept Plan or the Concept Plan Map attached to the agreement. Instead, the plain terms used throughout the agreement discuss intersections at Walter Strawn Drive and Illinois Route 53 and Waltner Strawn Drive and Hoff Road, further to the east. We find no ambiguity regarding the parties' obligations to build a bridge because a bridge is never mentioned within the four-corners of the agreement.

¶ 45    The circumstances surrounding the execution of the annexation agreement further support the conclusion that the parties intended to construct an intersection to connect the CIC-East

Addition to Walter Strawn Drive. In interpreting a contract, it is appropriate for courts to consider the circumstances at the time the contract was made. *In re Estate of Constantine*, 305 Ill. App. 3d 256, 260 (1999). In *Estate of Constantine*, the court emphasized:

> "When we consider the surrounding circumstances, we do not change the terms of the agreement or create an ambiguity where none exists. [Citation] Instead, we consider the circumstances surrounding execution of the document as part of the agreement, reflecting the clear intent of the signators." *Id.* at 260.

¶ 46   Here, at the time the parties entered into the agreement, the railroad crossing over the Union Pacific tracks on Walter Strawn Drive already existed and was accessible to tractor-trailers. This preexisting circumstance supports our interpretation that section 18(B) established the parties' responsibilities in constructing an intersection east of the crossing "*in order to extend* Strawn Road across Illinois Route 53 and eastward into the Subject Property," rather than a bridge. The intersection was the final component to the successful extension of Walter Strawn Road across Route 53 to the east. Defendants' argument that the term "in order to extend" imposed an obligation to construct a bridge over the Union Pacific tracks makes little sense considering the railroad crossing's existence at the time of the agreement's execution. See *Suburban Auto Rebuilders, Inc. v. Associated Tile Dealers Warehouse Inc.*, 388 Ill. App. 3d 81, 92 (2009) (courts will construe contracts reasonably to avoid absurd results).

¶ 47                                C. Section 47

¶ 48   Defendants' alternative argument is that the "best efforts" clause contained in section 47 of the Annexation Agreement should be read to require Elwood to consent to the construction of a bridge.

¶ 49   Section 47 states:

17

"Time of the Essence; Good Faith. It is understood and agreed by the parties hereto that time is of the essence of this Agreement, and that all parties will make every reasonable effort *** to expedite the subject matters hereof. It is further understood and agreed by the parties that the successful consummation of this Agreement requires the continued cooperation and best efforts of all parties."

¶ 50    Courts often view terms of "cooperation" and "best efforts" as vague and imprecise, causing them to be unenforceable. *Beraha v. Baxter Health Care Corp.*, 956 F. 2d 1436, 1441 (7th Cir. 1992) (holding contract terms involving expressions of good faith, such as participating with honesty and cooperation, are not enforceable under Illinois law); *Penzell v. Taylor*, 2019 Ill. App. 3d 680, 688 (1991) (statement that employer would use "best efforts" to ensure employee earned target salary was too vague to be an enforceable contract). Such terms as those found in section 47 have been viewed as mere vague expressions of goodwill, rather than an enforceable contractual promise. See *Beraha*, 956 F.2d 1436 at 1440-41 (agreement that developer would "do [its] very best to make this project a success" was merely a vague expression of good will, not an enforceable contract term).

¶ 51    To the extent that the duty of good faith is implied in all contracts, it is generally enforced when one party is vested with discretion and that discretion has been exercised in a manner inconsistent with the parties' expectations. *Eckhardt v. Idea Factory*, LLC, 2021 IL App (1st) 210813, ¶ 28. Where a party has discretion, it must be exercised fairly. See *Mid-West Energy Consultants, Inc. v. Covenant Home, Inc.*, 352 Ill. App. 3d 160, 165 (2004) (covenant of good faith requires that discretion be exercised reasonably and fairly).

¶ 52    According to the terms of the Annexation Agreement, both parties had limited discretion under section 18(B) as to the necessary improvements. Defendants, as the successors in interest,

agreed to make any improvements to the intersection as may be required by IDOT, and Elwood

agreed to execute any documents reasonably required by defendants to obtain IDOT permits.

Defendants concede that in making intersection improvement to extend Walter Strawn Drive to

the CIC East Addition, IDOT has not required or requested a bridge permit. Thus, Elwood's

contractual discretion has been fairly exercised.

¶ 53        Moreover, the duty of good faith cannot overrule or modify express terms of a contract.

*Northern Trust Co. v. VIII Michigan Assocs.*, 276 Ill. App. 3d 355, 367 (1995). Here, the

provisions in section 18(B) are specific, whereas those contained in section 47 are general.

"[W]here both a general and a specific provision in a contract address the same subject, the more

specific clause controls." *Grevas v. United States Fidelity & Guarantee Co.*, 152 Ill. 2d 407, 411

(1992) (citing 3 A. Corbin, Corbin on Contracts § 547 (1960)) . Defendants argument that the

general language in section 47 creates an additional obligation on Elwood to assist with the

construction of infrastructure that the parties never specifically considered is rejected.

¶ 54        It is clear the parties to the Annexation Agreement did not contemplate the closure of the

railroad crossing at Water Strawn Drive and the Union Pacific railway tracks which ultimately

thwarted defendants ability to extend Walter Strawn Drive across Route 53. However, where, as

here, the terms of the agreement are unambiguous, we must enforce the contract as written and

refrain from adding a new condition to which the parties did not agree. See *Standee v. Bostedt*,

2019 IL App (2d) 180325, ¶¶ 55, 63 (court cannot change or modify existing terms of a contract

or write something into the contract which the parties have omitted); see also *Leak v. Board of

Education of Rich Township High School District 227*, 2015 IL App (1st) 143202, ¶ 14 (court

cannot add new terms or conditions to which the parties do not appear to have assented). Elwood

and defendants do not dispute that the railroad crossing was completed in 2004, three years

19

before CenterPoint entered into the Annexation Agreement with Elwood. In addition, IDOT, with the financial assistance and cooperation of CenterPoint, finished the improved intersection by 2010, three years after the parties signed the agreement to annex the CIC-East Addition. The previous construction of the at-grade crossing and the subsequent construction of the improvements to the intersection are strong evidence of what the parties believed section 18(B) required. See *Standee*, 2019 IL App (2d) 180325, ¶ 56 (parties' past performance on a contract is indicative of their intent).

¶ 55 The plain and unambiguous terms of the Annexation Agreement did not impose a duty on Elwood to execute documents required to build a separation grade crossing over the Union Pacific tracks. Accordingly, the trial court erred in granting summary judgment in favor of defendants and imposing obligations on Elwood to assist defendants in constructing a bridge.

¶ 56                                    III. CONCLUSION

¶ 57 The judgment of the circuit court of Will County granting summary judgment in favor of defendants and denying summary judgment in favor of Elwood is reversed. Pursuant to our authority under Illinois Supreme Court Rule 366(a)(5)(eff. Feb. 1, 1994), we enter judgment in favor of Elwood on its declaratory judgment complaint and against defendants.

¶ 58 Reversed; judgment entered.